The Potter Press *vs.* C. W. Potter, Inc., & others.

Middlesex.     October 6, 1938. — July 7, 1939.

Present: Field, C.J., Donahue, Lummus, Qua, & Dolan, JJ.

*Unlawful Interference. Conspiracy. Corporation,* As conspirator. *Damages,* For tort. *Equity Pleading and Practice,* Plea; Master: findings; Decree, Appeal.

In a suit in equity based on alleged acts of unlawful interference with the plaintiff's business by the defendants acting in conspiracy, an order overruling pleas averring that there was no conspiracy, with leave to the defendants to present evidence on that issue should it be raised in the answers, was a proper exercise of discretion.

Where, upon an appeal from a final decree based on the report of a master in a suit in equity which included no report of the evidence and a statement that his determinative conclusion was based "upon all the evidence," such conclusion must stand unless it was inconsistent with particular subsidiary findings.

A finding that a defendant was a member of an unlawful conspiracy and responsible for all its doings was not precluded by the fact that he was not aware of the entire scope of the conspiracy or of all its details or of the identity of all its members; or by the facts that his share in its activities was small and did not begin until they were well under way, and that he was actuated by motives different from those of the other conspirators.

A corporation may be a conspirator.

Damages against defendants who in conspiracy unlawfully interfered with the plaintiff's business properly included the actual cost to the plaintiff of defending intentionally vexatious suits brought by one or another of the conspirators in pursuance of the conspiracy and the cost of a notice sent out by the plaintiff to correct a wrong impression created by conduct of the conspirators.

Defendants appealing from a final decree solely against them in a suit for relief against unlawful interference by acts done in conspiracy could not complain that the decree did not also run against other defendants found to be conspirators.

BILL IN EQUITY, filed in the Superior Court on March 25, 1936.

Pleas of certain defendants specifically denying conspiracy were heard by *Williams*, J., and were overruled "with leave to present evidence under issues raised by said pleas should such issues be raised in the answer." Those defendants appealed.

An interlocutory decree confirming the master's report and a final decree were entered by order of *Beaudreau*, J. Certain defendants appealed.

*E. F. McClennen,* (*E. Williamson* with him,) for the defendants C. W. Potter, Inc., and another.

*G. A. McLaughlin,* (*C. S. McLaughlin* with him,) for the defendant Potter.

*R. T. Bushnell,* (*A. C. Burnham & J. Lewiton* with him,) for the plaintiff.

LUMMUS, J. The facts appear in the report of a master. Charles W. Potter incorporated his printing business as the plaintiff corporation in 1912, and it maintained a precarious existence until 1919, when he opened negotiations with

Lorenz F. Muther. The latter induced his father to buy the assets and good will of another printing company and to convey them to the plaintiff. The stock of the plaintiff was redistributed. Muther's father received preferred stock which had no voting power, for his outlay, more than $180,000. Fifty-one per cent of the common stock, or five hundred ten shares, went to Lorenz F. Muther, and all but five shares passed from him to his wife, Josephine A. Muther. Four hundred ninety shares were divided equally between Potter and his associate Dakin. Potter was president, director and general manager. Muther was treasurer and director. Dakin was clerk and the third director. The plaintiff specialized in the production of salesbooks.

From 1919 until February, 1933, though Muther was an experienced business man interested in a number of enterprises, and kept in touch with the affairs of the plaintiff, the management of the plaintiff was in the hands of Potter. In his hands the plaintiff was extremely successful. The seven per cent dividend on the preferred stock was paid continuously, and in addition large dividends were paid on the common stock. Potter was justly proud of his ability and record, and somewhat impatient of any superior authority. By 1932, he had come to regard the business as his own and to resent the necessity of consulting Muther.

Muther, on the other hand, was piqued at not being consulted more freely, and, made apprehensive by the failure of other investments, began early in 1932 with the aid of Edith F. Cornell an investigation of the affairs of the plaintiff. Nothing wrong was discovered, but discord arose between Muther and Potter.

Potter had become interested in sales registers, which he thought might displace salesbooks, for the same store does not use both. On August 26, 1932, he incorporated the Atlantic Register Company for the purpose of going into the register business. As early as September, 1932, he had committed himself to building up its business with the aid of money obtained from a paper mill. That company did not come to the attention of Muther until February 28, 1933.

At the annual meeting of the plaintiff on January 16, 1933, the old officers were reëlected. At the directors' meeting later on the same day, Muther made proposals which were not acceptable to Potter. Muther proposed payment to himself of $2,000 and to Miss Cornell of $1,000 for services in the investigation, in addition to his salary as treasurer of $8,500. He proposed a reduction in Potter's salary to $15,000, thus cutting off a recent advance of $3,000. He proposed that Dakin, who had a salary of $3,500 as attorney, be employed thereafter by the case. After the meeting, Muther asked Potter for a list of persons who had received Christmas presents from the plaintiff, and Potter refused to give it. Potter said that it was obvious that he and Muther could not work together, and that one must buy out the other. Later, Muther came to the conclusion that his majority interests required that he control a majority of the directors. At a special meeting of the stockholders on February 20, 1933, the Muthers by voting their five hundred ten shares amended the by-laws by increasing the number of directors from three to six, and elected three more directors friendly to Muther.

Muther did not wish to get rid of Potter as president and general manager, but Potter insisted upon resigning, and Dakin resigned with him. The chief employees felt loyalty to Potter, and feared that the plaintiff could not succeed without him. Following the stockholders' meeting on February 20, 1933, they met, and Potter addressed them. He told them that he could take care of himself, and that they should not leave. But they continued to meet in the absence of Potter, and decided to form a new company, though they had little capital and no very definite plans, for they felt that Potter would help them.

These chief employees about February 22, 1933, formed a corporation called the Waltham Salesbook Company, Inc., for the purpose of selling salesbooks. They told Muther on February 23, 1933, that they would leave the employ of the plaintiff about March 1, 1933, unless Potter should be reinstated. They did leave, and began an active sales campaign, covering the routes that they had covered

for the plaintiff.   They made an arrangement with the
McCasky Company to furnish them with a product to sell.
Learning that Potter had plans for manufacturing sales-
books, they did not venture into that field.

On March 27, 1933, Potter completed the incorporation
and organization of C. W. Potter, Inc.   He obtained capi-
tal from paper mills in exchange for preferred stock of that
corporation and Atlantic Register Company.   In April,
C. W. Potter, Inc., started to manufacture salesbooks.
After some negotiations, Potter acquired substantially all
the stock of Waltham Salesbook Company, Inc., for cash,
and on September 18, 1933, all its assets were conveyed to
C. W. Potter, Inc., in consideration of the assumption of
its liabilities.   It continued to exist only as a "corporate
shell as a department of C. W. Potter, Inc."   The offices of
C. W. Potter, Inc., Waltham Salesbook Company, Inc., and
Atlantic Register Company are occupied in common, and the
three corporations are all "under the common management
and control of Potter."   The master does not find that any
of these companies in their formation and entrance into busi-
ness were part of any unlawful conspiracy to injure the plain-
tiff.   But he has found that some of the competitive acts of
the two companies first named have wronged the plaintiff.

The master finds that beginning in 1933 a persistent
attempt was made, by misrepresentations as to the finan-
cial standing of the plaintiff and otherwise, to induce its
salesmen to leave it and work for the Waltham Salesbook
Company, Inc., in some cases in violation of contracts with
the plaintiff.   The master finds, also, that salesmen em-
ployed by the Waltham Salesbook Company, Inc., have
represented to former customers of the plaintiff (a) that
the plaintiff was out of business, (b) that the plaintiff was
irresponsible and about to fail, or (c) that the two concerns
were identical, and have obtained orders through such mis-
representations.   He finds, also, that mail orders addressed
to the plaintiff were delivered by mistake to C. W. Potter,
Inc., which knowingly caused them to be filled by Wal-
tham Salesbook Company, Inc., without notification to the
plaintiff or the customers of the facts.

The master finds that one Wheeler, a former employee of the plaintiff who went over to Waltham Salesbook Company, Inc., upon its organization, brought an action for expenses against the plaintiff which he knew was groundless. He finds that Waltham Salesbook Company, Inc., in 1934 brought a bill in equity against the plaintiff alleging misrepresentations to customers injurious to Waltham Salesbook Company, Inc., and other unfair practices. After considerable preparation for defence on the part of the plaintiff, counsel for Waltham Salesbook Company, Inc., admitted that the case would never be brought to trial. It is still pending. The master finds that it was prosecuted in a manner calculated to annoy the plaintiff and cause it expense. As to a petition for mandamus against the plaintiff by a minority stockholder named Gooding, he finds that Gooding was a friend to Potter, that Gooding employed the young lawyer who was attorney for Waltham Salesbook Company, Inc., with whom he had never before done business, and that after certain information was furnished by the plaintiff the petition was dismissed. As to a bill in equity by Gooding against the plaintiff, alleging mismanagement, brought by the same counsel, the master finds that the allegations of the bill were extravagant, in places were couched in derogatory language, and to a great extent were unsupported by the facts. The young lawyer for Gooding gave a copy of the bill to a reporter for publication, having reason to believe that publication would injure the plaintiff. He knew that he could not expect the appointment of a receiver on the allegations of the bill, although the bill prayed for such an appointment. The master finds "that the bill was not brought in good faith for the best interests of all the stockholders, but was brought to damage . . . [the plaintiff] and to benefit Charles W. Potter, C. W. Potter, Inc. and Waltham Salesbook Company [Inc.]," and that Gooding's "actions were committed as part of and in pursuance of the conspiracy to injure The Potter Press." Potter was instrumental in the bringing of the suit for the purpose found to exist. A second suit was brought by Gooding through the same attor-

ney against the plaintiff, to attack upon technical grounds the validity of the increase in the number of directors of the plaintiff. The bringing of this suit was "one of those things which Gooding left entirely to the discretion of his attorneys."

The individual defendants did not see fit to testify. None of them testified except Gooding, Fox and Brady, the latter two employees of one of the defendant corporations, and all three were called by the plaintiff. The master finds that Potter was the centre and inspiration of the activities of the defendants, which were designed to compete with and incidentally to injure the plaintiff. He finds that C. W. Potter, Inc., and Waltham Salesbook Company, Inc., and E. James Steele, Henry Silberstein, Paul K. Wheeler, and William H. Brady, directors or employees or both of one of those companies, illegally conspired against the plaintiff, and that Fred M. Gooding was a willing tool in the conspiracy. Damages were assessed against them.

Exceptions of the defendants C. W. Potter, Inc., Waltham Salesbook Company, Inc., and Charles W. Potter were overruled, and the master's report was confirmed, subject to the appeals of those defendants.

The final decree gave an injunction against the defendants above named, permanently restraining various acts of unfair or illegal competition, awarding damages and costs against them, and dismissed the bill as against Atlantic Register Company and five individual defendants. The defendants C. W. Potter, Inc., Waltham Salesbook Company, Inc., and Charles W. Potter appealed.

1. The three appealing defendants, at the outset of the case, filed negative pleas denying conspiracy. These were overruled, subject to the appeals of these defendants, with leave to set up the same defence in the answers. Conspiracy was denied in the answers, and the question was fully heard on evidence before the master. The course taken by the judge was within his discretion. The defendants had no right to insist upon a preliminary decision of the single issue raised by their pleas. That issue was fully heard and decided before any decree was made, and that was all to

which the defendants were entitled. *Hancock* v. *Carlton*, 6 Gray, 39, 54. *Tansey* v. *McDonnell*, 142 Mass. 220, 221. *Pearce* v. *Rice*, 142 U. S. 28. *Chisholm* v. *Johnson*, 84 Fed. 384.

2. These defendants contend that the finding of a conspiracy was wrong. The first question is, whether that finding was made upon all the evidence, which is not reported in full, or was made as a mere conclusion from subsidiary facts fully stated. See *MacLeod* v. *Davis*, 290 Mass. 335, 338, 339. The master states: "In making this report it has been my purpose to state the material subsidiary facts and subsidiary conclusions which I have found upon all the evidence, leading me to the final conclusion of the existence of a conspiracy and the identity of the participants. However, I cannot say in a case of the extent and complexity of this case and the cases tried with it that every fact which has influenced me has been directly found. . . . With this statement of my intentions the only correct statement of the basis of my findings and final conclusion is that they are upon all the evidence." Under these circumstances the ultimate finding of a conspiracy must stand unless inconsistent with particular subsidiary findings. It is not enough for the defendants to show us that that finding is not a proper conclusion from the subsidiary findings reported, taken by themselves. *Dodge* v. *Anna Jaques Hospital*, 301 Mass. 431, 435–436.

3. It seems unnecessary to discuss in detail the attacks made by the defendants upon the general finding that a conspiracy existed. That finding is not inconsistent with any of the subsidiary findings. One may be held a member of an illegal conspiracy and responsible for all its doings, although he was not aware of its entire scope, or all its details, or the identities of all its members, and although his own share in its activities was small, did not begin until its activities were well under way, and was actuated by motives very different from those of his fellow conspirators. *Attorney General* v. *Tufts*, 239 Mass. 458, 493, 494. *Martineau* v. *Foley*, 231 Mass. 220, 223. *Lovejoy* v. *Bailey*, 214 Mass. 134, 153. *McDonnell* v. *United States*, 19 Fed.

(2d) 801, 803. *Coates* v. *United States,* 59 Fed. (2d) 173.
A corporation may be a conspirator. *Lovejoy* v. *Bailey,*
214 Mass. 134, 153. *Mills* v. *W. T. Grant Co.* 233 Mass.
140, 145. *Reed* v. *Home Savings Bank,* 130 Mass. 443.
*McCandless* v. *Furlaud,* 296 U. S. 140. *Buffalo Lubricating Oil Co.* v. *Standard Oil Co. of New York,* 106 N. Y. 669.

The defendants contend that upon the findings the prosecution of the suit in equity brought by Gooding against the plaintiff for alleged mismanagement was not part of the illegal means adopted by the conspiracy, and consequently that the cost of defending that suit, amounting to $16,051.23, was not properly assessable as damages against the defendants. The findings are to the contrary, that the suit was a vexatious one, not instituted in good faith, and was a part of the illegal means adopted by the conspiracy. For similar reasons, the sum of $384.26, the cost of defending the Wheeler action, was properly assessed as damages. That action was found to be groundless and "intentionally vexatious," to have been instigated by Potter, and to have been "in pursuance of the conspiracy." For like reasons the sum of $1,904.16, the cost of defending the suit brought by Waltham Salesbook Company, Inc., in 1934 was properly assessed as damages. The master found that the allegations in that suit "were not entirely groundless so far as they complained of price cutting," in which both Waltham Salesbook Company, Inc., and the plaintiff had indulged, although the former began it. During the proceedings the matter of price cutting was abandoned, yet the litigation was not closed. The master found: "I do not find this suit to be purely vexatious and malicious solely for the reasons (1) that it has never been brought to a conclusion and (2) that there was a basis in fact for the allegations of price cutting even though it is highly probable that the existing facts did not as a matter of law give rise to liability. The manner in which Waltham Salesbook Company [Inc.] and C. W. Potter, Inc. caused the case to be conducted however was such as to annoy and cause expense to The Potter Press. Except for the reasons just given I would find this suit to have been vexa-

tiously and maliciously brought." The reasons so given were unsound. The pendency of the suit did not prevent a determination that it was groundless and vexatious, or an injunction against its further prosecution. *Carleton & Hovey Co.* v. *Burns,* 285 Mass. 479, 482, 483. *Steinberg* v. *McKay,* 295 Mass. 139, 142–143. The allegation of price cutting seems hardly more than a pretext, later abandoned, for in 1933 and 1934, at least, price cutting was not a legal wrong, but was a lawful form of competition. See now G. L. (Ter. Ed.) c. 93, §§ 14E–14K (St. 1938, c. 410). At any rate, the master finds that Waltham Salesbook Company, Inc., had with respect to this suit "a corporate intent to injure the" plaintiff, which "was part and parcel of the conspiracy."

The actual cost of defending these proceedings, and not merely statutory taxable costs, was properly assessed as damages. Where the damages assessed for a wrong comprise the cost of prosecuting or defending legal proceedings, the statutory items of taxable costs do not constitute limits to the recovery. *Malloy* v. *Carroll,* 287 Mass. 376, 384–386.

The defendants contend that the master and the judge erroneously allowed as an element of damages an item of $1,500 as "the necessary and reasonable cost of a notice to all its [the plaintiff's] customers in May, 1933, to correct the misapprehension incident to the separation of Potter from the Potter Press and the organization of the new companies made necessary by reason of misrepresentations made by salesmen of Waltham Salesbook Company [Inc.]." Since those misrepresentations were made in pursuance of the conspiracy, the cost of the corrective notice was properly found a reasonable and necessary expense forced upon the plaintiff by the wrongdoing of the defendants.

The allowance of nominal damages of $1 for other loss caused by such misrepresentations is not made the subject of argument. The items of damages already discussed, namely, $16,051.23, $384.26, $1,904.16, $1,500, and $1, when added, make $19,840.65, the exact amount of damages awarded the plaintiff by the final decree. Obviously other items of damage reported by the master were not included

in the final decree, and consequently could not have harmed the defendants. Neither was any defendant harmed by the fact that the decree, rightly or wrongly, ran against some only of the defendants. The plaintiff has not appealed.

The exceptions to the master's report have not been specifically argued. They are waived; but some of them raise questions identical with those raised upon the final decree and discussed in this opinion. *Boston* v. *Dolan*, 298 Mass. 346, 355–356.

The third paragraph of the final decree, restraining the defendant Brady from being employed by other defendants prior to March 1, 1939, in violation of his contract with the plaintiff, must now be struck out, because it is based upon a contract which expired on that day.

Paragraph (1) (b) of the final decree begins by permanently enjoining the defendants from "any form of misrepresentation, indicating directly or by inference, to customers, prospective customers, or other persons that the said defendants or any of them are in any way associated or connected in business with The Potter Press." It continues: "and the said defendants are hereby directed and ordered to disclose the actual identity and management of the respondents C. W. Potter, Inc. and Waltham Salesbook Company, Inc. to any and all persons dealing with or proposing to deal with either of the said respondents or their respective representatives under the apparent belief that either of said corporations is or has at any time been connected or associated in business with The Potter Press." This second part of the paragraph, though based upon the sixth paragraph of the decree in *Summerfield Co. of Boston* v. *Prime Furniture Co.* 242 Mass. 149, seems to us unnecessary in the present case and a restriction which would in many instances lead to uncertainty and controversy. It should be struck out.

Other criticism of the language of the decree does not impress us. Neither does the attack made upon the bill as not affording a sufficient foundation of pleading to support the decree.

The result is, that the interlocutory decree overruling

the exceptions to the master's report and confirming that report, is affirmed; that the final decree is modified by striking out all of paragraph (1) (b) after the words "The Potter Press" where they first appear in said paragraph, and by striking out paragraph (3); and that as so modified the final decree is affirmed with costs.

*Ordered accordingly.*