**HAEMONETICS CORP.**

v.

**Theresa DUPRE.**

**Nova Biomedical Corporation**

v.

**Theresa Dupre.**

**Nos. Civ.A. 97–CV–11474–RGS,
97–CV–11475–RGS.**

United States District Court,
D. Massachusetts.

July 23, 1999.

MEMORANDUM AND ORDER FROM AN APPEAL OF AN ORDER OF THE UNITED STATES BANKRUPTCY COURT

STEARNS, District Judge.

Haemonetics Corporation and Nova Biomedical Corporation (Nova) appeal a decision of the Bankruptcy Court discharging civil conspiracy claims against Theresa Dupre, a debtor. The appellants are former employers of Theresa's husband, Paul Dupre. In November of 1994, Paul Dupre was indicted by a federal grand jury for embezzling $264,104.90 while employed as Nova's Payroll Supervisor and $656,274.31 while later employed as Haemonetics' System Administrator for Human Resources.[1] In 1994 and 1995, Haemonetics and Nova, respectively, filed civil actions in the Superior Court against Paul and Theresa, alleging a civil conspiracy. On May 10, 1995, Paul plead guilty to fourteen counts of wire fraud.[2]

On December 18, 1995, while motions for summary judgment were pending in the Superior Court, Theresa Dupre filed a Chapter 7 bankruptcy petition. Haemonetics and Nova countered with adversary proceedings claiming an exception from discharge under section 523(a) of the Bankruptcy Code.

Section § 523(a)(2)(A) of the Code states:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—...
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the

Richard D. Bickelman, Lawrence R. Holland, Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, P.C., Boston, MA, for Plaintiffs.

Peter J. Muse, Charles A. Dale, III, Quincy, MA, Hanify & King P.C., Boston, MA, for Defendant.

---

1. Paul Dupre embezzled from Nova from July of 1987 until he left the company in March of 1990. During his tenure at Nova, he was twice promoted. Paul left Nova to work at Haemonetics where he embezzled money until he resigned in July of 1994 to manage a variety store in Norton, Massachusetts.

2. Paul served approximately eighteen months in prison.

debtor's or an insider's financial condition

Section 523(a)(6) states:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—. . .

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

The Bankruptcy Judge (William Hillman) consolidated the cases and held a two day trial.[3] On May 22, 1997, Judge Hillman held that the conspiracy claims were dischargeable. On June 30, 1997, Nova and Haemonetics filed this appeal. The appellants do not quarrel with Judge Hillman's findings of fact. Rather, they contend that his ruling is "utterly illogical" in light of these findings. On July 6, 1999, this court heard argument on the appeal.

### FACTS

Judge Hillman found the following facts. Theresa and Paul Dupre were married in 1988. They have two minor children. Theresa holds a Bachelor of Science degree in Business Administration from Stonehill College where she took courses in accounting, investment, management, and economics. She later received a masters degree from Bentley College in computer information systems. Theresa Dupre has been employed at Analog Devices since 1986. She is presently a senior systems administrator.

From 1988 to 1994, Theresa and Paul earned combined yearly wages ranging from $53,000 to $65,000. During this time frame, Paul Dupre supplemented the couple's income by systematically embezzling nearly a million dollars from Nova and Haemonetics. The embezzled funds were deposited into six joint accounts maintained by the Dupres in six different banks.[4] Paul and Theresa also owned five joint securities' investment accounts.[5] The Dupre's home computer was equipped with Quicken money management software. Paul and Theresa used Quicken to keep track of the family's investments and finances. Regarding the Quicken program, Judge Hillman found as follows.

> At her meeting of creditors held pursuant to 11 U.S.C. § 341(a) Theresa was specifically asked if she had deleted any programs from the computer. She responded in the negative. In fact, as she testified before me, she had deleted Quicken and two other programs from the computer just prior to the meeting of the creditors. She also testified that the purpose of the deletions was to make room in the computer for certain children's programs, but I find as a fact that she deleted Quicken in an attempt to conceal the family's financial affairs from her creditors.

> I further find that Theresa was aware that her husband was providing funds for various accounts far in excess of his earnings. I find also that she was aware of the extent to which those cash infusions and of expenditures went beyond their disposable earnings from wages. Without giving all of the particulars upon which I make that finding, I point to the amount of cash in bank accounts overseas; the extent of an investment in a restaurant in Ireland; the amount of cash used to purchase real estate; and the totality of checks which Theresa signed on the accounts into which embezzled funds were deposited and for at least some of which she maintained the check registers. Her testimony that she only wrote checks at Paul's direction is contradicted in many particulars by other facts in the record and is not credible.

---

3. The appeals in the district court have also been consolidated.

4. Some of the money was deposited in a seventh account held solely in Paul's name.

5. Appellants state that this is a mistake and that, in fact, the uncontroverted evidence established six such accounts at different firms.

Theresa and Paul's joint tax return for 1992 listed securities trading totaling $1,500,000, resulting in a net gain of $35,209. In 1993, $2,964,786 in securities trading resulted in a net loss of $175,692. Judge Hillman concluded:

> I find as a fact that Theresa was intimately familiar with the amount of funds coming into the household in excess of earnings and of the use to which those funds were put. Her attempts to appear unsophisticated in the financial dealing is belied by the detailed nature of her testimony with respect to various transactions, the extent to which she managed or administered those dealings, and her participation in various activities resulting in or from the expenditure of the excess funds, all against a background of her specialized education on the collegiate and master's level.

Haemonetics and Nova argued to Judge Hillman that their claims against Theresa "ar[o]se from a civil conspiracy in which she participated with Paul to convert or otherwise deprive them of their property [and/or] the willful and malicious injury she caused their property." They thus had the burden of proving that Theresa knowingly conspired with Paul and that she engaged in wilful and malicious acts of conversion. Otherwise, as Judge Hillman noted, "[l]acking a tort the [appellants] lack a debt, and hence judgment must enter for Theresa."[6]

6. For appellants to prevail, they were required to prove a "debt" within the meaning of the Bankruptcy Code. A "debt" is defined by the Code as a "liability on a claim." 11 U.S.C. § 101(12). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). Tort liability is a debt within the definition of the Code.

7. § 876. Persons Acting in Concert
   For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

Analyzing the facts under section § 876 of the Restatement (Second) of Torts (1979),[7] Judge Hillman found the conspiracy claims dischargeable. He held that:

> [t]here is not an iota of evidence that Theresa acted in concert with Paul in the act of converting Plaintiffs' funds. Her liability cannot be based on § 876(a).

> Turning to the latter alternative of the Restatement, I have reviewed the evidence and can find neither direct evidence of Theresa's knowledge of the source of the funds, nor circumstantial evidence from which I could make a determination by a preponderance of the evidence. As a result, I find that she did not know that Paul's conduct constituted a breach of duty. Further, I find no support for the conjunctive element, the giving of substantial assistance or encouragement to Paul to embezzle.[8]

## DISCUSSION

The parties, citing *Williams v. Poulos*, 11 F.3d 271, 278 & n. 11 (1st Cir.1993), agree on the applicable standard of review.

> Insofar as the parties are challenging determinations made by the [lower] court prior to and in conjunction with the bench trial, our standard of review is familiar. Claimed errors of law are, of course, reviewed *de novo*.... Findings of fact, however, will not be set aside unless they are demonstrated to be clearly erroneous.... The clearly erro-

(a) does a tortious act in concert with the other or pursuant to a common design with him, or
(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, ....

8. Judge Hillman recognized that "Paul's conviction of embezzlement unquestionably constitutes actual fraud and conversion.... Were Paul the debtor in this case, the plaintiffs would have a strong case for nondischargeability against him under either clause of § 523 relevant here. The critical issue is whether, Paul's malfeasance can be attributed to Theresa."

neous standard also ordinarily applies when we review a trial court's resolution of mixed questions of law and fact.... In such situations, however, we are obligated to determine whether the court's resolution was infected by legal error.... And, "'if a trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard.'" .... In a recent case, we explained our review standard for mixed questions in a slightly different manner: "The standard of review applicable to mixed questions usually depends upon where they fall along [a] degree-of-deference continuum: the more fact dominated the question, the more likely it is that the trier's resolution will be accepted unless shown to be clearly erroneous."

■ A civil conspiracy can take one of two forms. In its first manifestation, "the wrong [is] in the particular combination of the defendants rather than in the tortious nature of the underlying conduct.... [A]nother form of civil conspiracy, reflected in the Restatement (Second) of Torts § 876 (1977), derives from 'concerted action,' whereby liability is imposed on one individual for the tort of another." *Kurker v. Hill*, 44 Mass.App.Ct. 184, 188, 689 N.E.2d 833 (1998).[9] As the Appeals Court observed, "[k]ey to this [latter] cause of action is a defendant's substantial assistance [to another], with the knowledge that such assistance is contributing to a common tortious plan." *Id.* at 189, 689 N.E.2d 833. Knowledge and participation (or assistance, to use the Restatement terminology) are conceptually distinct. Knowledge that another is committing a tort does not confer liability. Knowledge coupled with participation or assistance, however, does.

■ As proof of Theresa's knowledge, appellants point to her deletion of the Quicken program (which they plausibly cite as evidence of conscious of guilt),[10] her awareness of the fact that she and Paul were spending well in excess of their combined wages,[11] her financial sophistication and involvement in the management of the family's finances,[12] and her acknowledgment that she had access to and at least occasionally reviewed the monthly bank statements.[13]

This last factor is especially compelling. Statements from the New Bedford Institution for Savings, for example, show two transfers into the couple's account in late 1992 from "Haemonetics" in the amounts of $40,493.90 and $23,737.83, at a time when Paul's yearly income was only $33,-

9. Massachusetts has not adopted section 876 of the Restatement, although it "has been cited in the appellate decisions and, in some instances, has provided the basis for recovery." *Kurker*, supra at 189, 689 N.E.2d 833. See also *Kyte v. Philip Morris, Inc.*, 408 Mass. 162, 167, 556 N.E.2d 1025 (1990). A number of Massachusetts cases discussing civil conspiracy also cite common law definitions of conspiracy that are less demanding than the Restatement with regard to participation. See *Potter Press v. C.W. Potter, Inc.*, 303 Mass. 485, 492, 22 N.E.2d 68 (1939) ("One may be held a member of an illegal conspiracy and responsible for all its doings, although he was not aware of its entire scope, or all its details, or the identities of all its members, and although his own share in its activities was small, did not begin until its activities were well under way, and was actuated by motives very different from those of his fellow conspirators").

10. That an inference of consciousness of guilt can be drawn from the destruction of evidence is well-recognized in the law. See *Koonce v. Commonwealth*, 412 Mass. 71, 74 n. 4, 587 N.E.2d 220 (1992).

11. Judge Hillman did not find, as appellants appear to argue, that Theresa knew that their expenditures greatly exceeded their legitimate income. He only found that she knew that their expenditures and investments "went beyond their disposable earnings from wages."

12. Judge Hillman specifically found that "Theresa was intimately familiar with the *amount* of funds coming into the household in excess of earnings and of the use to which those funds were put."

13. All but the last factors figure in Judge Hillman's subsidiary findings.

186.30.[14] A 1994 bank statement from the Crescent Credit Union shows a similar "payroll" deposit in the amount of $40,625.30 [15] from Haemonetics. (Paul's 1994 pre-resignation earnings at Haemonetics were only $23,263.77). Given Theresa's admitted access to the bank statements and her extensive check writing, it defies belief that she would have been unaware that Paul was transferring money into the accounts that had been stolen from Haemonetics and Nova. Few people write checks (much less on six different accounts) without monitoring the balance. Fewer still would be so lucky to write as many checks as Theresa did (in excess of $100,00 worth in 1992) without ever registering an overdraft. Moreover, the Quicken program, which Theresa used to track family income and expenses, would have required her to identify the source and the amount of the deposits to the accounts. In sum, I am persuaded that the evidence could lead a reasonable person to only one conclusion, that Theresa not only knew that the accounts contained sums far in excess of the couple's income (as Judge Hillman found) but that she also knew that the excess funds had been stolen, in all probability from Haemonetics and Nova.[16] Thus I am persuaded that Judge Hillman's ultimate finding that Theresa did not know that the funds were illicit is clearly erroneous and contradicted by his subsidiary findings.

■ It is not sufficient, of course, to merely show knowledge on Theresa's part.

The evidence must also establish that Theresa was a participant in the scheme to convert the appellants' funds. Judge Hillman seemed to be the view that appellants were required in this regard to show that Theresa assisted Paul in the actual embezzlement to establish liability on her part. This, I believe, reflects a misunderstanding of the theory on which the appellants' case is based. The scheme alleged involved not one, but two conversions of the pilfered funds. The first conversion was the embezzlement itself for which appellants concede Paul bears the sole responsibility. The second conversion, and the one appellants seek to pin on Theresa, was the use of the money by the couple to support their extravagant lifestyle. While embezzlement was the driving logic of the alleged scheme, it was not its defining or sole object.[17]

■ Seen in this light the issue becomes one of Theresa's liability under section 523(a)(6) (and not section a(2)(A) which would apply more appropriately to Paul). To fall within the exception of § 523(a)(6), a debtor must be shown to have "willfully and maliciously" injured the property of another. That a conversion is an "injury" to property is not disputed. But the meaning of the phrase "wilful and malicious," which obviously speaks to the debtor's state of mind, was a fair subject of debate prior to *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).[18] The Supreme Court held in *Geiger*, that as used in section (a)(6), the

14. In her deposition, Theresa conceded that "there w[ere] occasions when I saw the [New Bedford Institution for Savings] statements."

15. This deposit is one of many appearing on the Crescent statements that clearly name Haemonetics as their source. The deposits range from as little as $163.54 to as much as $1819.41, and appear on a weekly, sometimes daily, basis.

16. At the very least, Theresa's conduct in this regard could be said to portray "a conscious course of deliberate ignorance." *United States v. Littlefield*, 840 F.2d 143, 147 (1st Cir.1988).

17. Judge Hillman is certainly correct that Paul's malfeasance cannot be imputed to Theresa by virtue of their married state. Despite appellee's suggestion to the contrary, see Brief, at 20–25, I do not understand appellants to be making such a feckless argument. The issue is not whether Theresa is Paul's wife, but whether knowing of his malfeasance, she participated in a scheme to convert the money that he had stolen.

18. See *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 858–859 (1st Cir.1997).

**230**

phrase means more than an intentional act leading to an injury. As the Court observed, because " 'wilful' in (a)(6) modifies the word 'injury,' . . . a deliberate or intentional *injury*, [and] not merely a deliberate or intentional *act* that leads to injury" is required. *Id.* at 61, 118 S.Ct. 974. In making this distinction, Justice Ginsburg noted that "the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.' " *Id.* at 61–62, 118 S.Ct. 974, citing Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964).[19]

The common law tort of conversion does not fall neatly into either of Justice Ginsburg's categories because the conduct it reaches spans both. At common law, a defendant who is shown to have exercised dominion over a plaintiff's property is liable for the resulting conversion, even where she reasonably and innocently believes that the property is her own. See *Row v. Home Savings Bank*, 306 Mass. 522, 525, 29 N.E.2d 552 (1940). At the other end of the spectrum, common law conversion encompasses torts, like embezzlement, that are also prosecutable as crimes. See *Commonwealth v. Ryan*, 155 Mass. 523, 30 N.E. 364 (1892).

■ Under *Geiger*, the debtor must thus be shown not only to have intended to exercise control over the plaintiffs' property, but to have done so intending the consequent injury to the plaintiffs' interest in the property. Here the record demonstrates that Theresa knew that the excess funds in the joint accounts were stolen. She nonetheless wrote checks on these funds.[20] Her intent was to convert the embezzled money to her own (and to Paul's) use, thereby permanently depriving

the true owners (Haemonetics and Nova) of their money. Her conduct clearly satisfies *Geiger*, and hence the appellants' claims against her are not dischargeable.

### *ORDER*

The May 22, 1997 Order of the Bankruptcy Court is *VACATED.* The case is hereby *REMANDED* to the Bankruptcy court with the instruction that judgment be entered for the appellants.

SO ORDERED.

---

19. An excellent discussion of the effect of *Geiger* on § 523(a)(6) case law appears in *In re Slosberg*, 225 B.R. 9, 16–21 (Bankr.D.Me. 1998).

20. Even if one takes the Restatement view that Theresa's participation in the scheme had to be "substantial," the number and amounts of the checks that she wrote clearly satisfies this test.