ELECTRONIC CITATION: 2012 FED App. 0007P (6th Cir.)
File Name: 12b0007p.06

# BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT

In re: THOMAS J. COTTINGHAM AND )
PATRICIA JOE COTTINGHAM, )
)
      Debtors. )
_____ )
)
)
JEROME EWERS, et al., )
)   No. 11-8042
      Plaintiffs-Appellees, )
)
)
      v. )
)
THOMAS J. COTTINGHAM, )
)
      Defendant-Appellant. )
_____ )

Appeal from the United States Bankruptcy Court
for the Eastern District of Kentucky, at Covington.
Bankr. Case. No. 09-22799; Adv. Pro. No. 10-2001.

Submitted: April 23, 2012

Decided and Filed: June 15, 2012

Before: FULTON, McIVOR, SHEA-STONUM, Bankruptcy Appellate Panel Judges.

_____

## COUNSEL

ON BRIEF: C. Ed Massey, BLANKENSHIP MASSEY & STEELMAN, PLLC, Erlanger, Kentucky,
for Appellant. William H. Blessing, THE BLESSING LAW FIRM, Cincinnati, Ohio, for Appellees.

---

## OPINION

---

SHEA-STONUM, Bankruptcy Appellate Panel Judge. The Debtor, Thomas J. Cottingham, appeals from an order excepting a debt owed to plaintiff, Spaces, Inc., from discharge pursuant to 11 U.S.C. § 523(a)(6). The bankruptcy court found that the Debtor, Thomas Cottingham, conspired with Co-Debtor Patricia Cottingham to convert embezzled funds and other property from Spaces, Inc. The Debtor argues that the bankruptcy court erred when it found the Debtor conspired with his wife and acted willfully and maliciously.

### I. ISSUES ON APPEAL

Is the bankruptcy court's finding that the Debtor Thomas Cottingham conspired with his wife to convert funds she embezzled from her prior employer Spaces, Inc. clearly erroneous?

Did the bankruptcy court clearly err when it found Debtor Thomas Cottingham caused willful and malicious injury to Plaintiff?

### II. JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States Bankruptcy Court for the Eastern District of Kentucky has authorized appeals to the Panel, and neither party has timely elected to have this appeal heard by the district court. 28 U.S.C. §§ 158(b)(6), (c)(1). A final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1). For purposes of appeal, an order is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States,* 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations and internal quotations omitted). "A bankruptcy court's judgment determining dischargeability is a final and appealable order." *Cash Am. Fin. Servs., Inc. v. Fox* (*In re Fox*), 370 B.R. 104, 109 (B.A.P. 6th Cir. 2007) (quoting *Hertzel v. Educ. Credit Mgmt. Corp.* (*In re Hertzel*), 329 B.R. 221, 224-25 (B.A.P. 6th Cir. 2005)).

Determinations of dischargeability under 11 U.S.C. § 523 are conclusions of law reviewed de novo. *In re Fox*, 370 B.R. at 109 (citing *Bailey v. Bailey* (*In re Bailey*), 254 B.R. 901, 903 (B.A.P. 6th Cir. 2000)). De novo review requires the "appellate court [to determine] the law independently of the trial court's determination." *Id.* (quoting *O'Brien v. Ravenswood Apartments, Ltd.* (*In re Ravenswood Apartments, Ltd.*), 338 B.R. 307, 310 (B.A.P. 6th Cir. 2006)).

However, "[t]he factual findings underlying the bankruptcy court's dischargeability ruling are upheld on appeal unless they are clearly erroneous." *Id.* (citing *In re Hertzel*, 329 B.R. at 225 and *Van Aken v. Van Aken* (*In re Van Aken*), 320 B.R. 620, 622 (B.A.P. 6th Cir. 2005) (dischargeability determinations present mixed questions of law and fact; the bankruptcy court's conclusions of law are reviewed de novo, while findings of fact are reviewed for clear error)). A bankruptcy court's findings of fact should not be disturbed simply because another trier of fact might construe the facts differently or reach a different conclusion. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). A factual determination should be upheld unless "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Bailey*, 254 B.R. at 903. (citation omitted).

## III.  FACTS

Thomas and Patricia Cottingham (together, the "Debtors") are married and until 2010, upon Patricia Cottingham's incarceration, lived together. They have two adult sons who lived with them through June 2006. From the early 1990's through June 2006, Debtors lived at 22 St. Nicholas Place, Ft. Thomas, Kentucky. They leased the St. Nicholas Place residence for $750 per month in rent.

Thomas Cottingham is a construction superintendent with 32 years of experience. He has held himself out as skilled in construction supervision and cost estimating. In the 1990's, the Debtors owned and operated a construction company called Cottingham Construction. The company failed and as a result the Debtors incurred substantial personal tax liabilities arising from the company's unpaid tax liabilities. In addition, the Debtors did not pay their personal income taxes in 2000 and 2001. The Debtors had a monthly payment obligation to the IRS as a result of these unpaid taxes. Thomas Cottingham was aware of the monthly payment obligation. The Debtors were at that time unable to meet all of their financial obligations.

After the failure of Cottingham Construction, Thomas Cottingham became employed by Performance Construction Company. From 2003 to 2009, his yearly gross income at Performance Construction Company was between $53,000 and $59,000 and his weekly take home pay was approximately $750. In addition, Thomas Cottingham receives $1,300 per month as part of a lifetime annuity as a result of a personal injury/death settlement.

Patricia Cottingham was employed by Cardiology Associates as a bookkeeper prior to February 1999. Her employment was terminated in 1999. In 2000, she was indicted and pled guilty to felony embezzlement of funds from her former employer Cardiology Associates. She was sentenced to five years of probation and required to pay $44,613.49 in restitution at the rate of $800 per month. By the time she was sentenced, Thomas Cottingham was aware of his wife's criminal activity and of the $800 per month restitution obligation.

In between the time she was terminated as a bookkeeper at Cardiology Associates and her indictment, Patricia Cottingham was hired by Spaces, Inc. as an "administrative assistant full charge bookkeeper." Plaintiff Jerome Ewers is the owner of Spaces, Inc. She was responsible for all of the accounting and in charge of the record keeping for the day to day operations of Spaces, Inc. She, however, did not have check signing authority for the bank accounts of Spaces, Inc. Her salary ranged from approximately $30,000 to $38,000 during her employment with Spaces, Inc. Her weekly take home pay was between $600-650 per week.

The Debtors paid their living expenses using a joint checking account with the Bank of Kentucky. Both Debtors had authority to sign checks drawn on this account, and both Debtors in fact wrote checks drawn on this account. In addition the Debtors had a joint account at Guardian Savings Bank. The Debtors used this account to pay certain bills, including the restitution payments.

The Debtors sometimes deposited their paychecks into these accounts. Often the Debtors would take large sums of cash back from these deposits, or the Debtors would cash their paychecks without an intervening deposit.

In 2001, Patricia Cottingham began embezzling funds and property from Spaces, Inc. Each successive year the amount she embezzled grew. In 2001 and 2002, Patricia Cottingham embezzled $16,765.27 from Spaces, Inc. The embezzled funds were deposited into the Debtors' joint bank

accounts. In 2003, Patricia Cottingham embezzled $64,328.30. All of the embezzled funds were deposited into the Debtors' joint bank account at Bank of Kentucky. In 2004, she embezzled $88,244.60 from Spaces, Inc. She deposited a little more than half of that money directly into the Debtors' joint account at Bank of Kentucky. The other half of the money was deposited first into a bank account Patricia Cottingham opened in her own name at Fifth Third Bank. In 2005, she embezzled $213,544.61 in cash. The money was initially placed in the Fifth Third Bank account and was moved from there to the Debtors' joint accounts or to pay the Debtors' expenses. In addition, Patricia Cottingham created a forged credit card account with Fifth Third Bank in the name of Spaces, Inc. The bills for the forged credit card were sent to the Debtors' residence. Patricia Cottingham paid those bills using embezzled funds. The total amount of those forged credit card purchases was $1,892.59. In 2006, the total cash embezzled was $283,391.88, and the total of the forged credit card purchases was $2,821.43. In 2007, she embezzled $328,516.10. In 2008, she embezzled $11,230.21.

Just as the amount she embezzled grew with each successive year, the Debtors' spending grew each successive year, at a rate that far exceeded any salary increase they might have received from an employer. Patricia Cottingham was not the only one to spend the embezzled funds. For instance, in June 2003, Thomas Cottingham paid off a $3,133.73 loan just 3 days after Patricia Cottingham deposited a check embezzled from Spaces, Inc. into the joint bank account. In December 2003, the Debtors paid another loan in the amount of $4,860.05 just two days after a check embezzled from Spaces, Inc. was deposited into the joint account at Bank of Kentucky. Similar events took place in 2004 when the Debtors purchased a computer, paid past due taxes and purchased a Jeep Wrangler.

The evidence presented at trial showed that in 2005, the Debtors deposited into their bank account a total of $32,539.49 from their paychecks. Contemporaneously with those deposits, the Debtors withdrew cash in the amount of $31,074.39 (by cash withdrawal, writing a check to cash or making an ATM withdrawal). Notwithstanding that the Debtors' net deposit of earned income in 2005 was only $1,465.10 in that same year, the Debtors spent $274,573.22 from their various bank accounts on "living expenses." Some of those expenses were the significant interior and exterior renovations to their rental home in 2005 and early 2006, which included landscaping, construction of a multi-tiered deck, and the installation of a spa. The Court found that based on Thomas

Cottingham's 32 years of experience in the construction industry, he must have known the cost of these renovations was significant.

Similarly in 2006, the Debtors spent far more than their earned income. Cash withdrawals from their bank account alone exceeded their earned income. In total, Patricia Cottingham embezzled $286,213.31 and the Debtors spent $391,731.16 from their bank accounts in 2006. The funds were used in part to purchase a new Jeep Commander. Thomas Cottingham was present at the time this purchase was made. Although he denied being aware of which bank accounts the down payment for the Commander was drawn on, the Court found his testimony was not credible and found that he knew that part of it came from the Fifth Third Account, just days after an embezzled check was deposited therein. In addition, he knew that, as a result of the purchase of the Commander, the Debtors incurred an ongoing monthly payment obligation of $666.72 per month. Further, in mid-2006, the Debtors decided to purchase a house. With her husband's knowledge, Patricia Cottingham approached Ewers, the owner of Spaces, Inc., to borrow $30,000 of the money for the purchase of the house from Ewers. In the documents prepared as a part of that home purchase, the Debtors included a letter indicating the $30,000 was a gift from their brother. In addition, Thomas Cottingham wrote a letter explaining the family's recent financial history and difficulties. As a part of the loan process, Thomas Cottingham signed a statement that showed their income was exceeded by their liabilities.

After buying the house the Debtors' spending continued. There were additional moving expenses, repayment of the $30,000 loan, home improvement expenses, including kitchen flooring, counter tops, new appliances, new heating, venting and air conditioning systems. The Debtors also spent over $60,000 on their adult children.

In 2007, the pace and amount of the Debtors' spending continued to increase. The Debtors spent money on a golf vacation ($2,632.76), a new swimming pool, patio, and pool house addition, driveway, and other exterior improvements to the home ($71,285.17), down payments on four new vehicles ($19,595.93); interior renovations and improvements ($37,979.20); wedding expenses for their son ($12,230.50), plus an additional approximately $30,000 on their sons. In total, the Debtors spent in excess of $460,366.24 in 2007.

In addition to money, Patricia Cottingham also stole household goods with a wholesale value of $127,156 from Spaces, Inc. Most of those stolen items are on display or in use in the Debtors' home. The bankruptcy court concluded that Thomas Cottingham must have known of his wife's embezzlement and subsequent conversion of funds. The bankruptcy court found Thomas Cottingham's assertion of ignorance to be incredible. The bankruptcy court pointed out the significant amount by which their annual expenditures exceeded their combined yearly salary. The court agreed with Debtors' counsel that this is often the hallmark of debtors spending. The disparity in this case, however, was so outrageous, the court found that Thomas Cottingham had to have been aware that Debtors' spending exceeded their earned income. "Most certainly [it] put Thomas on notice as to the excessive and unusual amounts of funds flowing in and out of the Debtors' bank accounts." Thomas Cottingham had access to the joint accounts. The court noted that with relative ease he could determine precisely what money was flowing in and out of those accounts. He wrote checks and made deposits into those accounts. The bankruptcy court found that he could not "cry innocent because he chose to keep himself in the dark about the specifics." Furthermore, he participated in purchases the Debtors could not have afforded on their salary alone, and he signed paperwork (tax returns and loan documents) detailing the Debtors' financial situation.

Specifically, the bankruptcy court considered "(1) the significant disparity between the Debtors' income and expenses, a disparity that continued to increase over the course of the embezzlement; (2) Thomas' access to and participation in the family's finances; (3) the cost of the home improvements; and (4) Thomas' knowledge that Patricia had recently pled guilty to embezzling funds from her prior employer." The court concluded, "Thomas cannot conveniently stick his head in the sand and say that he did not have knowledge of Patricia's activities until the day she admitted her guilt. His proffered ignorance is not credible." "He was an active participant in the conversion of the stolen funds and property."

## IV. DISCUSSION

Based on the evidence in the record regarding Thomas Cottingham's access to and involvement in the family finances, the bankruptcy court's finding that Thomas Cottingham was an active participant in the conversion of Plaintiff's assets, is adequately supported. The question is not whether the Panel would have found otherwise were it the initial fact finder in this case, but whether,

upon a review of the record the Panel is left a definite and firm conviction that a mistake has been made. On the record in this case, the Panel is not left with such a conviction. The bankruptcy court's findings of fact are not clearly erroneous.

While the bankruptcy court's findings of fact are not disturbed unless clearly erroneous, the bankruptcy court's conclusions of law are reviewed *de novo*. Section 523(a)(6) of the Bankruptcy Code excludes from the debtor's discharge, debts for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). A willful injury is one "where the [debtor] 'desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it.'" *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455, 464 (6th Cir. 1999) (quoting Restatement (Second) of Torts § 8A, at 15 (1964)); *Gonzalez v. Moffit* (*In re Moffit*), 252 B.R. 916, 921-22 (B.A.P. 6th Cir. 2000). Malicious injury means an injury caused in "conscious disregard of one's duties or without just cause or excuse." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). There is no requirement that the debtor acted with ill-will or a specific intent to cause harm. *Id.*

In this case, the Plaintiff has alleged that Thomas Cottingham is liable because he conspired with his wife and participated in the scheme that injured Spaces, Inc. In cases where similar allegations have been made and proven, courts have denied the self-proclaimed "innocent spouse" a discharge of the debt under § 523(a)(6). *See Haemonetics Corp. v. Dupre* (*In re Dupre*), 238 B.R. 224 (D. Mass. 1999), *aff'd,* 229 F.3d 1133, 200 WL 1160447 (1st Cir. 2000) (unpublished)*; Synod of S. Atl. Presbyterian Church v. Magpusao* (*In re Magpusao*), 265 B.R. 492, 498-500 (Bankr. M.D. Fla. 2001); *Navistar Fin. Corp. v. Stelluti* (*In re Stelluti*), 167 B.R. 29, 34 (Bankr. S.D.N.Y. 1994).

In *In re Dupre*, the debtor's husband embezzled money from his employer. He was indicted and pled guilty on 14 charges of wire fraud. His former employers also filed civil actions against the debtor and her husband alleging civil conspiracy. The debtor filed her bankruptcy petition in the midst of the civil litigation. The husband's former employers commenced an adversary proceeding against the debtor alleging the debt should not be discharged pursuant to § 523(a)(6).

The bankruptcy judge found that embezzled funds were placed in the debtor's joint bank accounts, that the debtor was aware that her husband was providing funds for the accounts far in excess of his earnings, and that the debtor knew the amount of cash and expenditures far exceeded

their earned income. The bankruptcy court also found that she signed yearly tax returns and that she was intimately familiar with the amount of funds coming in and out of the household. He found her claim of ignorance to be incredible. The former employers argued before the bankruptcy court that their claims against the debtor arose from the civil conspiracy between her and her husband. Despite his factual findings, the bankruptcy court found the conspiracy claims dischargeable, writing, "[t]here is not an iota of evidence that Theresa acted in concert with Paul in the act of converting Plaintiffs' funds. . . . I have reviewed the evidence and can find neither direct evidence of Theresa's knowledge of the source of the funds, nor circumstantial evidence from which I could make a determination by a preponderance of the evidence." *Id.* at 227.

The district court reversed the bankruptcy court and found that the evidence did show knowledge of and participation in the scheme to convert the employers' funds. "The scheme alleged involved not one, but two conversions of the pilfered funds. The first conversion was the embezzlement itself for which appellants concede Paul bears sole responsibility. The second conversion, and the one appellants seek to pin on Theresa, was the use of the money to support their extravagant lifestyle." *Id.* at 229. The district court found that her willful participation in the conversion of the funds to bankroll her lifestyle satisfied the exception to discharge under § 523(a)(6). *Id.* at 230.

Similarly, the bankruptcy court in *In re Magpusao* noted,

Courts have generally held that fraudulent intent may not be imputed from one spouse to another based simply on the marital relationship of the parties. *See First Tex. Sav. v. Reed* (*In re Reed*), 700 F.2d 986, 993 (5th Cir.1983); *In re Maltais*, 202 B.R. 807, 811–12 (Bankr.D.Mass.1996); *First USA v. Savage* (*In re Savage*), 176 B.R. 614, 615 (Bankr. M.D. Fla.1994); *First Alliance Bank v. Crider* (*In re Crider*), 171 B.R. 909, 911–12 (Bankr. N.D. Ga.1994); *Chicago Title Ins. Co. v. Mart* (*In re Mart*), 75 B.R. 808, 810 (Bankr. S.D. Fla.1987). Even knowledge of a spouse's misconduct is insufficient to confer liability. *Haemonetics v. Dupre*, 238 B.R. 224, 228 (D.Mass.1999); *Mart*, 75 B.R. at 810. Rather, knowledge must be concurrent with participation in the use or enjoyment of the stolen property in order for liability to attach.

*In re Magpusao*, 265 B.R. at 498. (footnote omitted). The court in *Magpusao* found the debtor had knowledge concurrent with participation in the use or enjoyment of at least some of the property his spouse had stolen. Therefore, the court excepted a certain amount of the debt from discharge.

To prevail in this case, the Plaintiff had to show Thomas Cottingham's knowledge of and participation in the conversion of Plaintiff's assets. A civil conspiracy is derived from concerted action of one or more persons whereby liability is imposed on one for the tort of another and properly found that a defendant's knowledge of and participation in a conspiracy can be inferred from the evidence presented to the court. The bankruptcy court found that Thomas Cottingham had knowledge of and participated in the scheme to convert the pilfered funds for his own benefit. Thomas Cottingham spent the money from the joint bank accounts to buy things like computers and cars, and was aware of the cost of the household improvements and the debtor's outstanding financial obligations. He could not reasonably have believed that their lifestyle was supported by their earned income. The bankruptcy court's inference, based on the evidence, that Thomas Cottingham knew his wife was embezzling from her new employer, is not clearly erroneous.

Based on the evidence, the bankruptcy court properly concluded that Thomas Cottingham is liable for all amounts arising from Patricia Cottingham's willful and malicious injury. *See United States v. Barker Steel Co., Inc.*, 985 F.2d 1123, 1128–29 (1st Cir.1993) ("It is well settled that members of a conspiracy are legally responsible for the actions of a co-conspirator taken in furtherance of the scheme.") (citing *Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Baines*, 812 F.2d 41, 42 (1st Cir.1987); *United States v. Fusaro*, 708 F.2d 17, 21 (1st Cir.1983)). "Once it is determined that a conspiracy had been formed, all parties to the conspiracy are civilly liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. 'A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action ... so long as the purpose of the tortious action was to advance the overall object of the conspiracy.'" *Int'l Telecomms. Satellite Org. v. Colino*, 1992 WL 93129 (D.D.C. 1992); *accord Rivet v. State Farm Mut. Auto. Ins. Co.,* 316 Fed. Appx. 440 (6th Cir. 2009) (evidence that parties acted in collusion with each other makes each responsible for the acts of the other); *United States v. Elson*, 577 F.3d 713, 723 (6th Cir. 2009) (applying a similar rule in the context of criminal conspiracy). Patricia Cottingham embezzled the funds, but the Debtors jointly conspired to convert those funds to serve their own purposes. Thomas Cottingham, therefore, is responsible for all of the injury caused by or in furtherance of the conspiracy.

## V. CONCLUSION

The bankruptcy court did not err in finding that Thomas Cottingham conspired with Patricia Cottingham to convert embezzled funds and other property from Spaces, Inc. Thomas Cottingham's conspiracy in the conversion of Plaintiff's assets constitutes willful and malicious injury to Plaintiff and the entire debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). The Panel AFFIRMS the decision of the bankruptcy court.