**In re Rodolfo C. MAGPUSAO and Adelita Magpusao, Debtors.**

**Synod of South Atlantic Presbyterian Church, a non-profit Florida corporation, Plaintiff,**

**v.**

**Rodolfo C. Magpusao and Adelita Magpusao, Defendants.**

**Bankruptcy No. 00–4792–3P7.**
**Adversary No. 00–297.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Aug. 6, 2001.

---

494

Lester Makofka, Jacksonville, FL, for defendant, Rodolfo Magpusao.

James Bledsoe, Jacksonville, FL, for plaintiff.

Jennifer Blair, for debtors.

Gregory Crews, Jacksonville, FL, trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This adversary proceeding is before the Court upon a complaint of Synod of South Atlantic Presbyterian Church, against Debtors/Defendants, Rodolfo and Adelita Magpusao, seeking an exception to discharge pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6). The Court conducted a three-part trial on April 5, May 3, and May 16, 2001. Upon the evidence presented and submissions by the parties, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Rodolfo ("Mr. Magpusao") and Adelita Magpusao ("Mrs. Magpusao") (collectively the "Magpusaos") were married in 1973 in the Philippines and immigrated to the United States in the early 1980's with their children.

2. In 1985, Mr. Magpusao obtained his present position as a security guard

with Florida Community College at Jacksonville where he currently earns an annual salary of approximately $20,000.

3. In 1988, Mrs. Magpusao commenced employment with the Plaintiff, Synod of South Atlantic Presbyterian Church (the "Synod") as its primary bookkeeper. Her responsibilities included managing the Synod's bank account, maintaining financial records, and most significantly, handling the church's finances. Her annual income at the Synod was approximately $20,000. In 1996, Mrs. Magpusao also established an oriental décor business. The income for this business in 1998 was $20,000.

4. In 1992, the Magpusaos moved from their first home (the "Lucente Home") to a new residence (the "Wiclif Home"). However, they retained the Lucente Home as rental property until its sale in 1999.

5. The Magpusaos owned a joint checking account (the "Joint Account") where Mr. Magpusao deposited his salary. This account was used to pay household and other expenses.

6. In 1991, Mrs. Magpusao began to misappropriate the Synod's funds by issuing unauthorized checks to herself, her personal creditors, and other individuals. According to the Synod's investigation, she embezzled nearly $543,332 over an eight-year span. She deposited approximately $162,000 of the embezzled funds into the Joint Account.

7. Mrs. Magpusao's fraud was ultimately discovered on June 18, 1998 by her supervisor, Ms. Jackie Davis. Mrs. Magpusao was arrested and charged with grand theft under Florida Statute § 812.014(2)(A). On January 28, 1999, Mrs. Magpusao pled guilty to misappropriation of funds and was convicted of grand theft and sentenced to a ten-year prison term. She is currently being held in state custody.

8. On June 22, 2000, the Magpusaos filed their joint voluntary petition for relief under Chapter 7 of the Bankruptcy Code and listed the Synod as an unsecured creditor in the amount of $560,000.

9. The Synod initiated this adversary proceeding seeking to except its debt from the Magpusaos' discharge pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6).

10. Mrs. Magpusao failed to answer the complaint and did not appear at the trial.

11. Mr. Magpusao, who appeared at trial, testified that his wife concealed her criminal activities from him. He asserts, therefore, that he neither knew of nor participated in his wife's embezzlement scheme.

## CONCLUSIONS OF LAW

The Synod seeks to determine the dischargeability of a debt under §§ 523(a)(4) and (a)(6) of the Bankruptcy Code, which state, in relevant part:

(a) a discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny [or] . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. §§ 523(a)(4), (6) (West 2001).

Exceptions to discharge prevent a debtor from avoiding the consequences of wrongful conduct by filing a bankruptcy case. *Hall v. Johann (In re Johann),* 125

B.R. 679, 681 (Bankr.M.D.Fla.1991). However, courts narrowly construe the exceptions to discharge against a creditor and liberally in favor of a debtor in order to "ensure that the 'honest but unfortunate debtor' is afforded a fresh start." *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994). The Court will address each exception accordingly.

## 1. 11 U.S.C. § 523(a)(4)

### a. Fraud or defalcation while acting in a fiduciary capacity

■ In order to establish a claim under § 523(a)(4), the plaintiff must prove that (1) the defendant was acting in a fiduciary capacity, and (2) while acting in a fiduciary capacity, the defendant committed fraud or defalcation. *NesSmith Elec. Co. v. Kelley (In re Kelley)*, 84 B.R. 225, 228 (Bankr. M.D.Fla.1988).

■ The existence of a fiduciary relationship is determined by federal bankruptcy law rather than state law. *Cladakis v. Triggiano (In re Triggiano)*, 132 B.R. 486, 490 (Bankr.M.D.Fla.1991). Federal courts have found that "the traditional meaning of the term 'fiduciary'—a relationship involving confidence, trust and good faith—to be far too broad for bankruptcy purposes." *Liberty Nat'l Bank v. Wing (In re Wing)*, 96 B.R. 369, 374 (Bankr.M.D.Fla.1989). This Court has held that § 523(a)(4) applies only when the plaintiff can prove the existence of an express or technical trust. *Mendez v. Cram (In re Cram)*, 178 B.R. 537, 541 (Bankr. M.D.Fla.1995). An express or technical trust exists when "there is a segregated trust res, an identifiable beneficiary, and affirmative trust duties established by contract or by statute." *Cladakis*, 132 B.R. at 490.

■ The facts and evidence in this case do not show that an express or technical trust existed. Consequently, no fiduciary relationship could have resulted between the Synod and Mr. Magpusao. Accordingly, the Court does not find that Mr. Magpusao committed fraud or defalcation while acting in a fiduciary capacity pursuant to 11 U.S.C. § 523(a)(4).

### b. Embezzlement

■ Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. *J.C. Faw v. Wiles (In re Wiles)*, 166 B.R. 975, 980 (Bankr.M.D.Fla.1994) (citing *In re Kelley*, 84 B.R. 225, 231 (Bankr.M.D.Fla. 1988)). Although proof of a fiduciary relationship is unnecessary to prevail on an embezzlement claim, the creditor must show evidence of fraud or fraudulent intent. *See Kelley*, 84 B.R. at 231. The evidence does not demonstrate that Mr. Magpusao was either entrusted with or lawfully received the property of the Synod. Accordingly, the Court does not find that Mr. Magpusao has committed embezzlement for purposes of 11 U.S.C. § 523(a)(4).

### c. Larceny

■ Larceny is the fraudulent taking and carrying away of the property of another with intent to convert such property to his use without the consent of another. *Wiles*, 166 B.R. at 980. The facts of this case do not demonstrate that Mr. Magpusao engaged in the "fraudulent taking and carrying away" of the Synod's property. Accordingly, the Court does not find that Mr. Magpusao has committed larceny for purposes of 11 U.S.C. § 523(a)(4).

## 2. 11 U.S.C. & 523(a)(6)

■ Section 523(a)(6) excepts from a debtor's discharge any debt "for willful

**498**

and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (West 2001). The burden of proof rests on the creditor to prove the elements of the statute through a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In order to be successful under § 523(a)(6), the plaintiff must demonstrate the following elements: (1) an intentional action by the defendant; (2) done with the intent to harm; (3) which causes damage (economic or physical) to the plaintiff; and (4) the injury is the approximate result of the action by the defendant. *Citizens First Nat'l Bank v. Hunter (In re Hunter)*, 229 B.R. 851, 860 (Bankr.M.D.Fla. 1999).

The Synod argues that since the Magpusaos shared the Joint Account, knowledge of activity in the account should be imputed to Mr. Magpusao. Thus, the Synod contends that Mr. Magpusao should be presumed to have known that his wife deposited approximately $162,000 of misappropriated funds into the Joint Account and should be held accountable for the Synod's resulting loss in that amount.

Courts have generally held that fraudulent intent may not be imputed from one spouse to another based simply on the marital relationship of the parties.[1] *See First Tex. Sav. v. Reed (In re Reed)*, 700 F.2d 986, 993 (5th Cir.1983); *In re Maltais*, 202 B.R. 807, 811–12 (Bankr. D.Mass.1996); *First USA v. Savage (In re Savage)*, 176 B.R. 614, 615 (Bankr.

M.D.Fla.1994); *First Alliance Bank v. Crider (In re Crider)*, 171 B.R. 909, 911–12 (Bankr.N.D.Ga.1994); *Chicago Title Ins. Co. v. Mart (In re Mart)*, 75 B.R. 808, 810 (Bankr.S.D.Fla.1987). Even knowledge of a spouse's misconduct is insufficient to confer liability. *Haemonetics v. Dupre*, 238 B.R. 224, 228 (D.Mass.1999); *Mart*, 75 B.R. at 810. Rather, knowledge must be concurrent with participation in the use or enjoyment of the stolen property in order for liability to attach.

The Court finds that Mr. Magpusao was not as ignorant of his wife's malfeasance as he claims. Although the Code does not permit attribution of intent from one spouse to another, fraudulent intent may be inferred from the totality of the circumstances and the conduct of the person accused. *Computer Prod. v. Nahabedian (In re Nahabedian)*, 87 B.R. 214, 215 (Bankr.S.D.Fla.1988).

Mr. Magpusao's demeanor at trial showed him to be an intelligent and astute individual, despite his attempt to appear ignorant of financial matters. He appeared well-informed regarding the nature and operation of mortgages and consignment shops. He showed surprising familiarity and control over an old bank account. In fact, he was even able to recite the account number by memory. The Court also noticed that Mr. Magpusao had sufficient knowledge of the family's income to determine what expenditures were beyond their means, as evidenced by his objections to the purchase of the Philip-

---

**1.** Relying upon the case of *In re Warsh*, 29 B.R. 841, 845 (Bankr.M.D.Fla.1983), the Synod contends that Mr. Magpusao made his wife his agent by allowing her to handle the family finances. The Synod has misconstrued the holding of this case. *Warsh* limits the agency relationship (and the derivative liability) between spouses to those instances where one

spouse is permitted to control the *separate statutory property* of the other. *Warsh*, 29 B.R. at 845 (citing *Craft v. Am. Agric. Chem. Co.*, 81 Fla. 55, 87 So. 41, 42 (1921)). In this case, the Magpusaos *shared joint ownership* of their bank account. Thus, the agency principle announced in *Warsh* is inapposite.

pines property[2] and cash gifts to ailing relatives in the Philippines. His testimony revealed that his wife solicited his advice regarding certain expenses and that they discussed mortgages on their home. Yet when asked how the family afforded a new car or rent payments on Mrs. Magpusao's shop, Mr. Magpusao simply professed ignorance and insisted that his wife handled all financial matters. Mr. Magpusao's selective knowledge and summary denials hamper his credibility.

Mr. Magpusao claims that he did not witness any unusual or extravagant expenditures. However, the evidence shows there was quite a bit of money expended on behalf of the family in the form of trips to the Philippines, allowances to the children, a new automobile, and various credit card purchases.

Mrs. Magpusao was also involved in entrepreneurial ventures. She opened an oriental décor business and promoted cultural activities, endeavors that undoubtedly required investment capital. She made no attempt to conceal these activities from her husband. Mr. Magpusao explained to the Court that his wife was able to promote the cultural events because she was eventually reimbursed. He also maintained that his wife did not have to compensate her merchandise supplier until she sold the goods. This does not explain, though, how Mrs. Magpusao paid the rent, utilities and other business-related expenses. Furthermore, his testimony shed no light on how she acquired the seed money for these ventures.

The evidence also revealed that the Magpusaos maintained mortgages on two separate homes. Mr. Magpusao did not refute knowledge as to the existence of the mortgages. Instead, he claimed that the rental income from the Lucente Home offset its mortgage expenses. Although, the monthly mortgage payments on the Lucente Home were approximately $584, Debtor's income tax return for 1998 only showed that he received approximately $291 from rent payments. The Magpusaos were also making payments on the Wiclif Home in the amount of $768 per month. Mr. Magpusao failed to reasonably explain how they paid the mortgage differential on the rental property while making concurrent payments on their residence and paying utility, credit card and other bills. These expenses were clearly in excess of the Magpusaos' limited after-tax income.

Finally, in April 1998, the Magpusaos took out a second mortgage in the amount of $18,700. Mr. Magpusao explained the purpose of this mortgage was to enable his wife to expand her business. Despite her need for the funds, Mr. Magpusao claimed that it remained in its entirety in the Joint Account until he was able to conveniently utilize it for expenses relating to his wife's arrest in June 1998. In fact, on cross-examination, it was determined that only $4,094 was available in the account on the date of Mrs. Magpusao's arrest. Two days later, over $10,000 appeared in the account. Mr. Magpusao denied knowledge of any unauthorized funds and insisted that the money came from the second mortgage. It seems unbelievable to the Court that on the days subsequent to his wife's arrest, Mr. Magpusao would not have thoroughly scrutinized the Joint Account prior to writing a check for such a large amount. By this time, Mr. Magpusao was abundantly aware of his wife's embezzlement, he knew she had used their

---

**2.** In 1998, Mrs. Magpusao considered purchasing real estate in the Philippines for $6,000. Mr. Magpusao testified that he opposed the purchase because he did not think they had enough money to buy the property. Nevertheless, the Magpusaos proceeded with the purchase.

Joint Account to hide some of the money, and he knew that there was a great likelihood that the remaining money in the account rightfully belonged to the Synod. Nevertheless, he proceeded to use it for his own purposes. Where the specter of suspicion is present, there is a duty to be cautious in the use of tainted funds. The Court holds Mr. Magpusao in abrogation of this duty. In the absence of an explanation accounting for the source of these funds, the Court finds that this money was derived from the embezzled funds.

Although the evidence demonstrated numerous instances of Mr. Magpusao's knowledge and participation in the use or enjoyment of Synod property, the record also contains items indicating that Mr. Magpusao was unaware of his wife's illegal conduct. Mr. Magpusao testified that in accordance with Filipino tradition, it was his wife who managed the family's finances. His assertion is supported by the fact that it was Mrs. Magpusao who signed all, but one, of the checks drawn from the Joint Account. Given that Mrs. Magpusao was a bookkeeper and skilled in account management, it is likely that Mr. Magpusao did not regularly, if ever, monitor the bank account. Furthermore, Mrs. Magpusao's factual stipulation for her guilty plea corroborated Mr. Magpusao's defense:

> "[Mrs.] Magpusao stated that she was the only one involved in the theft and that not even her husband was aware of what she was doing.... Subsequent to [Mrs.] Magpusao's arrest, an inventory was conducted of items in her purse. A [Synod] check with one of [Mrs.] Magpusao's ... deposit slips ... was located in the purse. The [Synod] check was made payable to Adelita Magpusao.... The [account] ... is maintained solely by [Mrs.] Magpusao. It was determined that this is the account that she funnelled all the money ... through so that

her husband was not aware of this money."

Finally, the Synod's own agent, Ms. Jackie Davis, testified to the Court that upon confronting Mrs. Magpusao with her discovery, Mrs. Magpusao pleaded with her not to tell her husband fearing that he might kill her. These items suggest that Mrs. Magpusao intended to hide her criminality from her husband.

In light of Mrs. Magpusao's efforts to conceal her crime, her control over the Joint Account, and Mr. Magpusao's inattention to the activity in the account, the Court does not find that Mr. Magpusao knew of or participated in the use and enjoyment of Synod funds to the extent claimed by the Synod. The Court finds credible Mr. Magpusao's assertions that he was unaware of the checks paid to various unauthorized individuals. Several of these individuals were unknown to Mr. Magpusao and the Synod failed to present proof linking him to these persons.

The Synod has also attempted to hold Mr. Magpusao liable for credit card expenses and phone bills. Yet the Synod has not provided the Court with statements reflecting the purchases or calls showing that Mr. Magpusao knew of or utilized those accounts. Similarly, the Synod wishes to attribute liability to Mr. Magpusao for checks written by his wife to their children. Once again, the Synod has failed to establish either knowledge or beneficial use of those funds.

The Court does not find that Mr. Magpusao knew of the degree to which his wife was stealing from her employer. However, the Court does find that Mr. Magpusao was aware that his wife was receiving money from an unexplained source, even though he did not actively solicit her ill-gotten gains. Instead, he accepted only those benefits that she herself conferred upon him. Based upon these findings, the

Court cannot hold Mr. Magpusao liable for all of the embezzled funds that his wife deposited in the Joint Account. He can only be held accountable for items that he knew were acquired illegally and which he nevertheless accepted. Accordingly, the Synod debt is nondischargeable as to those items pursuant to 11 U.S.C. § 523(a)(6).

### 3. Mr. Magpusao's Liability under § 523(a)(6)

The Court has carefully reviewed the items purchased or financed through funds stolen from the Synod and determines the following debts to be nondischargeable:

| Item | Amount |
| --- | --- |
| Toyota Camry | $ 4,963.50 |
| Trips to Philippines [3] | $ 2,768.63 |
| Property in Philippines | $ 6,000.00 |
| Payment to bail bondsman | $10,000.00 |
| Check to Mr. Magpusao | $ 1,000.00 |
| **TOTAL** | **$24,732.13** |

### a. Equitable Lien

■ Plaintiff also requests the imposition of an equitable lien[4] upon the Magpusaos' homestead and argues that the down payment in the amount of $6,000, mortgage payments in the amount of $3,075, and a satisfaction of the second mortgage in the amount of $12,206 (totaling $21,281) were paid through proceeds from the embezzled funds.

■ Florida's Constitution protects a Debtor's homestead from levy by creditors by providing that:

> There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty.

Fla. Const. art. X, § 4(a)(1). Courts interpreting the Florida Constitution have liberally construed the homestead exemption in the interest of protecting the family home while curtailing its reach when it threatened to become an instrumentality of fraud or an imposition upon creditors. *Havoco of Am. v. Hill,* 790 So.2d 1018, 1020 (Fla.2001) (citing *Milton v. Milton,* 63 Fla. 533, 58 So. 718, 719 (1912)); *In re Tabone,* 247 B.R. 541, 543 (Bankr.M.D.Fla. 2000) (stating that "while the homestead exemption must be liberally construed, it may not be used as an instrument of fraud.").

■ An equitable lien is "a remedial tool used to prevent an inequity of one party against another, and may be used as a means of enforcing, against a piece of property, a party's obligation that has resulted in a benefit to that property." 34 Fla.Jur.2d *Liens* § 4 (2000). This remedy

---

**3.** The Synod claims that between January 1991 and April 1998, Mr. Magpusao visited the Philippines three times while Mrs. Magpusao visited five times. The Synod showed further that approximately $7,383 was spent in connection with these trips. The Court does not hold Mr. Magpusao accountable for his wife's expenses relating to these trips. However, no information was provided to help the Court determine the cost of each individual trip. Consequently, the Court must derive its own formula. Since Mr. Magpusao only visited on three of the eight trips, he will be held liable for only ⅜ of the travel expenses.

**4.** The Synod has requested that the Court impose a constructive trust upon the Magpusaos' homestead property in its favor. However, the case law submitted in support of the request discusses an equitable lien. Although the Synod uses the two terms interchangeably, the Court believes that an equitable lien rather than a constructive trust is appropriate in this case.

is appropriate where a plaintiff has made "a sufficient showing ... of the existence of certain circumstances calling for equitable intervention, such as fraud." *Id.* § 9.

In *Havoco*, the Supreme Court of Florida clarified the circumstances under which an equitable lien upon homestead property would be appropriate. The Court reaffirmed its strict adherence to the three exceptions laid forth in the homestead exemption. The Court also stated that while its equitable lien jurisprudence did not create a fourth "fraud exception", it did not hesitate to "invoke equitable principles to reach beyond the literal language of the exceptions ... where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead." *Havoco,* 790 So.2d at 1027.

The invocation of equitable remedy was exemplified in *Palm Beach Sav. & Loan Ass'n v. Fishbein,* 619 So.2d 267 (Fla. 1993). In that case, the Court permitted the imposition of an equitable lien against homestead property where a lender demonstrated that the debtor had fraudulently acquired a loan and used it to satisfy three preexisting mortgages on his residence. The Court determined that this result was permissible under the Florida Constitution pursuant to the doctrine of equitable subrogation: "We allowed the Palm Peach bank to stand in the shoes of the prior mortgagees who would have been entitled to proceed against the Fishbeins' homestead under the express terms of article X, section 4." *Havoco,* 790 So.2d at 1024.

In the instant case, the Synod has demonstrated that Mrs. Magpusao fraudulently acquired funds to pay for the down payment and mortgage on the Wiclif Home and that Mr. Magpusao knowingly benefited from her fraud. In order to prevent unjust enrichment, the Court sees fit to apply the equitable principles announced by the Supreme Court of Florida in *Fishbein* and *Havoco,* and allows the Synod to step into the shoes of the former mortgagees. Therefore, the Court finds that an equitable lien imposed upon the Magpusaos' homestead in the amount of $21,281 is an appropriate remedy.

### CONCLUSION

The Court finds that a portion of the debt owed to the Synod by Mr. Magpusao was the result of "willful and malicious injury" and is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). Accordingly, the Synod's debt is nondischargeable in the amount of $24,732.13. Additionally, an equitable lien is imposed upon the Magpusaos' homestead in the amount of $21,281. A separate order will be entered in accordance with thee Findings of Fact and Conclusions of Law.