In re Carl VASILE and Teresa Vasile, Debtors.

Automotive Finance Corporation, Plaintiff,

v.

Carl Vasile and Teresa Vasile, Defendants.

Bankruptcy No. 02–1465–3F7. Adversary No. 02–131.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Aug. 12, 2003.

Elizabeth M. Bohn, Miami, FL, for Plaintiff.

Richard R. Thames, Jacksonville, FL, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This adversary proceeding came before the Court upon a complaint filed by Automotive Finance Corporation ("Plaintiff"). Plaintiff seeks to have the debt owed to it by Carl and Teresa Vasile ("Defendants") excepted from Defendants' discharge pursuant to 11 U.S.C. § 523(a)(2)(A).[1] Defendants consent to the entry by the Court of a final judgment regarding dischargeability but not a final judgment awarding damages. The Court conducted a trial on Feb-

ruary 27, 2003 and April 10, 2003 and took the matter under advisement. Upon review of the evidence entered at trial and upon review of the post-trial submissions, the Court makes the following Findings of Fact and Conclusions of Law.

Plaintiff is in the business of making short term loans to [automobile] dealers to purchase inventory. (Tr. at 35.) Plaintiff finances the actual purchase price paid by a dealer. (Tr. at 35.) Defendants were the owners of four related businesses: (i) the Volusia Car Clinic, Inc. (the "Car Clinic"), an automobile collision repair shop; (ii) Union Credit Sales and Leasing, Inc. ("Union Credit"), a wholesale dealer of automobiles and motorcycles; (iii) United Pacific Leasing, Inc., an automotive and motorcycle sales and leasing company which conducted business under the fictitious name Auto Temps Rental Cars and Sales ("Auto Temps"), and (iv) R.C. Towing, Inc. ("R.C. Towing"), a company which provided towing services for the other three entities.

The Car Clinic was the first of the four businesses to be incorporated and began doing business in 1993. (Defs.' Ex. 61.) Although Teresa Vasile is the sole shareholder of the corporation and was its initial president, Carl Vasile ran its day-to-day operations and made all of its business decisions. The Car Clinic operated from leased premises at 526 Mason Avenue in Daytona Beach, Florida. (Tr. at 411.)

Union Credit was formed in 1996. (Tr. at 411.) As with the Car Clinic, although Teresa Vasile is the sole shareholder of the corporation and was its president until February, 2001, Carl Vasile ran its day-to-

---

1. Although the Complaint sought an exception to Defendants' discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A)(Count I), 523(a)(2)(B)(Count II), and 523(a)(6)(Count III), Plaintiff's post-trial memorandum referred only to § 523(a)(2)(A)(Count I). The

Court therefore deems Counts II and III abandoned and will only address Count I in its Findings of Fact and Conclusions of Law. The Court will enter a judgment in favor of Defendants as to Counts II and III.

day operations and made all of its business decisions. Union Credit operated from the same facility as the Car Clinic. (Tr. at 411.)

A profitable and mutually beneficial relationship developed between the Car Clinic and Union Credit. Union Credit purchased wrecked vehicles at the auction, R.C. Towing towed them to the Car Clinic, and the Car Clinic repaired them. (Tr. at 419.) Union Credit then sold 90–95 % of the repaired vehicles on a wholesale basis at the auction. Over the years Union Credit purchased, repaired and sold thousands of vehicles in this manner.

Union Credit's business flourished. In 1997 its gross sales were $6,066,502.00 (Defs.' Ex. 23.); In 1998 its gross sales were $9,811,810.00 (Defs.' Ex. 24.); In 1999 its gross sales were $10,782,352.00 (Defs.' Ex. 25); and in 2000 its gross sales were $15,485,382.00. (Defs.' Ex. 26.) Union Credit's growth and sales volume enabled it to obtain credit from a number of automobile floor-plan financiers, including Plaintiff.

In June 1997 Union Credit obtained a $40,000.00 line of credit with Plaintiff to enable it to purchase inventory. By January, 2000 Plaintiff had increased Union Credit's line of credit to $200,000.00. Teresa Vasile personally guaranteed the loan. (Pl.'s Ex. 1 at 4.) The loan agreements contained the following provisions:

2.1–*Discretionary Advances.* AFC may, it its sole discretion, from time to time make an Advance to or on behalf of Dealer for the purpose of enabling Dealer to purchase and/or hold Purchase Money Inventory for resale

2.2–*Advance Requests.* Dealer may request an Advance by providing AFC with: (a) a copy of the bill of sale which indicates the vendor and the actual purchase price of the Purchase Money Inventory; and (b) as to Vehicles, a completed Odometer Disclosure Statement and the Title duly assigned by the Dealer.

Many of the vehicles that Union Credit floor planned with Plaintiff were purchased by Union Credit at auction, in which case Plaintiff paid the auction directly. (Tr. at 3.) Union Credit also enjoyed outside privileges with Plaintiff which enabled it to finance the acquisition of vehicles purchased as outside buys, purchases from sources other than the auction. In order to obtain financing for an outside purchase, Union Credit was required to present Plaintiff with a vehicle's title and bill of sale indicating the seller and the actual purchase price. Plaintiff advanced credit based upon the lower of: (i) the purchase price reflected on the bill of sale or (ii) the average value reflected in the "Blackbook", a published guide of wholesale prices for automobile dealers. If the "Blackbook" did not contain a given vehicle, Plaintiff based its lending decision on its relationship with the dealer.

In November, 1998 Defendants formed United Pacific Leasing, Inc. with the idea of getting into the rental car business. (Defs.' Ex. 57, Tr. at 415.) On October 15, 1999 Carl Vasile became United Pacific's president. (Defs.' Ex. 57.) United Pacific was dormant until June 2000 at which time Defendants leased a lot at 837 Mason Avenue and registered for and obtained the fictitious name Auto Temps. Over the next several months Carl Vasile began acquiring wrecked motorcycles, utilizing Union Credit's license and relationship with various auctions. R.C. Towing retrieved the motorcycles from the auctions and delivered them to the Car Clinic for repair. The repaired motorcycles were titled in Auto Temps' name. Carl Vasile testified that often parts from several motorcycles were used to create one motorcycle.

Auto Temps did not get off to the great start Carl Vasile had hoped for. Carl Vasile decided to terminate Auto Temps' business operations and to consolidate his businesses at 526 Mason Avenue. Carl Vasile testified that he decided not to immediately sell the motorcycles he had acquired and repaired because he wanted to sell them closer to "Bike Week", an annual gathering of motorcycle enthusiasts in Daytona Beach. Instead, he opted to floor plan the motorcycles with Plaintiff.

On December 6, 2000 Carl Vasile presented Plaintiff a bill of sale evidencing the purchase by Union Credit from Auto Temps of a 1998 Ford Explorer XLT and a 1996 Dodge Ram with purchase prices of $12,500.00 and $10,000.00 respectively. (Pl.'s Ex. 37 at 402.) (AFC Stock Nos. 481, 482.) Union Credit purchased both vehicles on August 2, 2000 for $1,600.00 and $1,550.00 respectively. (Defs.' Exs. 92 at 4538, 93 at 4417.) On October 4, 2000 both vehicles were titled in Auto Temps' name. (Defs.' Exs. 92 at 4527, 93 at 4411.) Although the Explorer and the Ram were wrecked when Union Credit originally purchased them and when it sought financing, the purchase prices set forth on the bill of sale represented their repaired value. (Tr. at 339, 477.) In reliance upon the bill of sale and the titles, Plaintiff issued a check to Union Credit in the amount of $22,500.00 on that same day. (Pl.'s Ex. 8.)

On December 11, 2000 Carl Vasile presented Plaintiff with a bill of sale evidencing the purchase by Union Credit from Auto Temps of ten motorcycles and two cars. Included in the bill of sale were the following motorcycles for which Plaintiff has not been repaid:

1.) a 2000 Honda CBR 800 motorcycle with a purchase price of $9,000.00. (Pl.'s Ex. 37 at 405.) (AFC Stock No. 496.) Union Credit purchased the motorcycle for $1,730.00 on November 21, 2000. (Pl.'s Ex. 38 at 4376.) The title included the notation "SALVAGE TITLE: REBUILDABLE". (Id. at 4365.)

2.) a 1998 Suzuki Katana 600 motorcycle with a $4,500.00 purchase price. (Pl.'s Ex. 37 at 405.) (AFC Stock No. 498.) Union Credit purchased the motorcycle for $2,035.00 on November 8, 2000. (Pl.'s Ex. 39 at 4231.)

3.) a 1994 Yamaha XJ 600 motorcycle with a $4,000.00 purchase price. (Pl.'s Ex. 37 at 405.) (AFC Stock No. 500.) Union Credit purchased the motorcycle for $1,060.00 on November 6, 2000. (Pl.'s Ex. 40 at 9203.)

4.) a 1999 Kawasaki Vulcan 800 motorcycle with a $7,000.00 purchase price. (Pl.'s Ex. 37 at 405.) (AFC Stock No. 501.) Union Credit purchased the motorcycle for $1,475.00 on October 27, 1999. (Pl.'s Ex. 42 at 9416.)

5.) a 2000 Kawasaki Ninja 900 motorcycle with a $9,000.00 purchase price. (Pl.'s Ex. 37 at 405.) (AFC Stock No. 503.) Union Credit purchased the motorcycle for $4,320.00 on September 7, 2000. (Pl.'s Ex. 41 at 4140.) The title included the notation "REBUILT". (Defs. Ex. 97 at 9429.)[2]

---

2. Carl Vasile testified that a rebuilt title is issued when a motorcycle which was purchased with a salvage title or certificate has been repaired. (Tr. at 186.) "Maybe it just needed a fender, a headlight, a front wheel and some forks... you still have to repair the vehicle, you have to get it inspected by the D.M.V., and at that point they will issue you a new title that will retain the same VIN number, the same year, but it will have the word 'rebuilt' on it." (Tr. at 187.)

Carl Vasile presented the bill of sale to Plaintiff in order to obtain financing in the amounts of the purchase prices reflected on the bill of sale. Ordinarily, Plaintiff did not inspect vehicles before it extended credit. However, because it had little experience with motorcycle financing, Plaintiff sent its representative, Toygar Par, to Union Credit on December 12, 2000 to inspect the motorcycles.[3] Par testified that during his brief visit he inspected the ten motorcycles and two cars. He testified that neither the motorcycles nor the cars were wrecked. (Tr. at 41–42.) Carl Vasile testified that one of the cars which Par inspected had already been repaired and the other was on the frame machine being finished up. (Tr. at 440–441.) Carl Vasile also testified that he showed Par a second batch of motorcycles which were wrecked and indicated that he planned to floor plan them with Plaintiff later in December or early January. (Tr. at 441.) Par testified that he did not remember whether Carl Vasile showed him any other motorcycles that day but indicated that Carl Vasile did not tell him that any of the vehicles he was financing either on that day or at a later date were vehicles that he "built". (Tr. at 502.) Par testified that he would have inspected them if Carl Vasile had made such a comment. (Id.) Following Par's verification that the motorcycles and cars existed, Plaintiff gave Union Credit a check for $118,500.00, of which $33,500.00 represented the above motorcycles. Because there was no "BlackBook" for motorcycles, Plaintiff relied solely on the invoices presented by Carl Vasile as accurately representing the purchase prices paid for the motorcycles.

Carl Vasile testified that he told Par during the December 12, 2000 visit that Auto Temps was his company. (Tr. at 124.) Par testified that he was not aware that Auto Temps was Carl Vasile's company and that Carl Vasile did not tell him during the December 12, 2000 visit. (Tr. at 42–43, 501.) Gainey testified that Plaintiff learned Auto Temps was Carl Vasile's company only after the account was in default. (Tr. at 284–285.) Additionally, none of the financial documents supplied by Defendants to Plaintiff reflected an interest in Auto Temps. (Comp. Ex. 3, Tr. at 284.)

On December 18, 2000 Carl Vasile presented Plaintiff a bill of sale evidencing the purchase by Union Credit from Auto Temps of a 1998 Honda 1520 motorcycle and a 1997 Harley Davidson Buell motorcycle with purchase prices of $10,000.00 and $7,500.00 respectively. (Pl.'s Ex. 37 at 404) (AFC Stock Nos. 508, 509.) Union Credit purchased the Honda on November 2, 2000 for $2,995.00 (Pl.'s Ex. 43 at 4316) and the Harley Davidson on November 7, 2000 for $2,900.00. (Pl.'s Ex. 44 at 9500.) Both titles included the notation "REBUILT". (Pl.'s Ex. 43 at 4310, Pl.'s Ex. 44 at 9477.) In reliance on the purchase prices set forth on the bill of sale, on December 18, 2000 Plaintiff issued a check to Union Credit in the amount of $28,500.00, of which $17,500.00 represented floor plan financing for the two motorcycles. (Pl.'s Ex. 8.)

On December 21, 2000 Carl Vasile presented Plaintiff with a bill of sale evidencing the transfer from Auto Temps to Union Credit of the following:

---

**3.** Alonzo Gainey, Plaintiff's branch manager since June 2000, testified that except for the occasional auction purchase for which Plaintiff paid the auction directly, Plaintiff did not floor-plan motorcycles. However, it financed the motorcycles for Union Credit as outside buys because Union Credit was a great customer whom Plaintiff wanted to accommodate. (Tr. at 287–288.)

1.) a 1999 Suzuki 600 motorcycle with an $8,000.00 purchase price. (Pl.'s Ex. 37 at 403.) (AFC Stock No. 510.) Union Credit purchased the motorcycle on August 17, 2000 for $2,395.00. (Defs.' Ex. 101 at 4299.)

2.) a 1999 Suzuki 750 with an $8,500.00 purchase price (Pl.'s Ex. 37 at 403.) (AFC Stock No. 511). The Court was presented with no evidence as to the original purchase price of the motorcycle.

3.) a 2000 Yamaha Royal Star with a $14,500.00 purchase price (Pl.'s Ex. 37 at 403.) (AFC Stock No. 512.) Union Credit purchased the motorcycle on November 7, 2000 for $3,620.00. (Pl.'s Ex. 47 at 4556.) The title Carl Vasile presented to Plaintiff to obtain financing included the notation "ASPT". (Id. at 4546.) [4]

4.) a 2000 Kawasaki 750 with a $10,000.00 purchase price (Pl.'s Ex. 37 at 403.) (AFC Stock No. 513.) Union Credit purchased a 1999 Kawasaki ZX 900 on November 7, 2000 for $3,875.00. (Pl.'s Ex. 48 at 4581, 4585.) The title Carl Vasile presented to Plaintiff to obtain financing included the notation "ASPT". (Id. at 4578.)

5.) a 2000 Suzuki 600 with a $9,000.00 purchase price. (Pl.'s Ex. 37 at 403.) (AFC Stock No. 514.) Union Credit purchased a 1999 Suzuki GSXR750 on October 10, 2000 for $2,800.00. (Pl.'s Ex. 50 at 4646.) The motor and body parts from that motorcycle along with the frame of another were used to create the 2000 Suzuki 600 for which Auto Temps was issued an "ASPT" title. (Pl.'s Ex. 49 at 4661, 4655.)

6.) a 2000 Suzuki 750 with a $10,000.00 purchase price. (Pl.'s Ex. 37 at 403.) (AFC Stock No. 515.) The frame of the 1999 Suzuki GSXR750 along with the motor, transmission, body molding, front end and gas tank of another motorcycle were used to create the 2000 Suzuki 750 for which Auto Temps was issued an "ASPT" title. (Pl.'s Ex. 49 at 4662, Ex. 50 at 4626.)

7.) a 2000 Kawasaki 750 with a $10,000.00 purchase price. (Pl.'s Ex. 37 at 403.) (AFC Stock No. 516.) Union Credit purchased a 1998 Kawasaki 750 motorcycle on November 9, 2000 for $1,420.00. (Pl.'s Ex. 51 at 4607.) On that same day Union Credit purchased a Kawasaki 750 motor for $330.00. (Pl.'s Ex. 51 at 4621.) Union Credit used the frame, front end, body molding, and gas tank from the 1998 Kawasaki 750 motorcycle along with the Kawasaki 750 motor to create the 2000 Kawasaki 750 for which Auto Temps was issued a 2000 "ASPT" title. (Pl.'s Ex. 51 at 4619, 4620, 4621, and 4597.)

In reliance on the purchase prices set forth on the bill of sale, on December 22, 2000 Plaintiff issued a check to Union Credit in the amount of $50,000.00 to floor plan AFC Stock Nos. 510–514. (Pl.'s Ex. 45 at 4289.) On December 26, 2000 Plaintiff issued a check to Union Credit in the amount of $20,000.00 to floor plan AFC Stock Nos. 515 and 516. (Pl.'s Ex. 8.)

On January 8, 2001 Carl Vasile presented Plaintiff a wholesale order evidencing the purchase by Union Credit of a 2000

---

**4.** Carl Vasile explained that an "ASPT" title is issued for a motorcycle that is assembled from parts. "It is a title that is issued by the State of Florida that you, in a sense, are building a motorcycle ... you're taking pieces from one motorcycle and creating a new creation... It's a bike that was assembled from various parts to create a whole new entity, a whole new VIN number, whole new year, and a whole new title." (Tr. at 185.)

Chevrolet Metro for $7,500.00. (Pl.'s Ex. 37 at 406.) (AFC Stock No. 517.) Union Credit purchased the automobile from North American Fleet Sales ("North American"), a company for which Carl Vasile was an agent. (Tr. at 168–160.) North American had purchased the vehicle on October 11, 2000 for $1,200.00. (Pl.'s Ex. 52 at 4525.). On January 9, 2001 Plaintiff issued a check to Union Credit in the amount of $7,350.00 to floor plan the vehicle. (Pl.'s Ex. 8.)

On January 9, 2001 Carl Vasile presented Plaintiff a wholesale order evidencing the purchase by Union Credit from Auto Temps of a 1999 Suzuki 600 motorcycle for $9,800.00 (Pl.'s Ex. 37 at 398.) (AFC Stock No. 518.) The title presented to Plaintiff included the notation "RE-BUILT". (Pl.'s Ex. 53 at 4234.) Union Credit purchased the motorcycle on November 2, 2000 for $1,545.00. (Id. at 4250.) In reliance on the purchase price set forth on the wholesale order, on January 9, 2001 Plaintiff issued a check to Union Credit in the amount of $9,800.00 to floor plan the motorcycle. (Pl.'s Ex. 8.)

On January 9, 2001 Carl Vasile presented Plaintiff a wholesale order evidencing the purchase by Union Credit from Auto Temps of a 2000 Kawasaki 600 motorcycle for $11,200.00. (Pl.'s Ex. 37 at 400.) (AFC Stock No. 519.) The title presented to Plaintiff includes the notation "RE-BUILT". (Pl.'s Ex. 54 at 4144.) Union Credit purchased the motorcycle on November 2, 2000 for $1,695.00. (Id. at 4145.) In reliance on the purchase price set forth on the wholesale order, on January 9, 2001 Plaintiff issued a check to Union Credit in the amount of $11,200.00 to floor plan the motorcycle. (Pl.'s Ex. 8.)

On January 15, 2001 Carl Vasile presented Plaintiff a wholesale order evidencing the purchase by Union Credit from Auto Temps of a 2000 Ford Explorer 4X4 with a purchase price of $18,200.00. (Pl.'s Ex. 37 at 399.) (AFC Stock No. 520.) Union Credit purchased the vehicle on January 4, 2001 for $3,095.00 (Pl.'s Ex. 55 at 4691–4692.) On January 15, 2001 the vehicle was titled in Auto Temps' name. (Id. at 4686.) Although the Explorer was wrecked when Union Credit originally purchased it and when it sought financing, the purchase price set forth on the wholesale order represented its repaired value. (Id. at 4693–4696.) In reliance on the purchase price set forth on the wholesale order, on January 15, 2001 Plaintiff issued a check to Union Credit in the amount of $18,200.00 to floor plan the vehicle. (Pl.'s Ex. 8.)

On January 16, 2001 Carl Vasile presented Plaintiff a wholesale order evidencing the purchase by Union Credit from Auto Temps of a 2000 Pontiac Grand Prix with a purchase price of $12,000.00. (Pl.'s Ex. 37 at 401.) (AFC Stock No. 521.) Union Credit purchased the car on January 11, 2001 for $2,090.00. (Pl.'s Ex. 56 at 4430.) On January 16, 2001 the vehicle was titled in Auto Temps' name. (Id. at 4426.) Although the Grand Prix was wrecked when Union Credit originally purchased it and when it sought financing, the purchase price set forth on the wholesale order represented its repaired value. (Id. at 4431–4433.) In reliance on the purchase price set forth on the wholesale order, on January 17, 2001 Plaintiff issued a check to Union Credit in the amount of $12,000.00 to floor plan the vehicle. (Pl.'s Ex. 8.)

Carl Vasile testified that when he financed the motorcycles and vehicles with Plaintiff his investment therein approximated or exceeded the amounts for which he floor-planned them. (Tr. at 434.) However, he admitted that [Union Credit's] high volume of business made it impossible to keep track of every receipt for

every vehicle that was repaired and that the absence of repair receipts for a given vehicle was "not extraordinary". (Tr. at 160.)

There was a relationship of trust between the parties. (Tr. at 287–288.) Prior to the December 6, 2000 financings Union Credit had floor planned and paid off the loan balances on over 480 vehicles and had never missed a payment. (Tr. at 292–293.) Gainey testified that Union Credit was an ideal customer and that based upon Union Credit's and Carl Vasile's history with Plaintiff, he had no reason to doubt that the purchase prices on the bills of sale and wholesale orders reflected the prices Union Credit originally paid for the vehicles and motorcycles. (Id.)

Union Credit first missed a payment on January 22, 2001. Shortly thereafter, Gainey visited Union Credit's lot for the first time. (Tr. at 290.) During the visit Gainey learned that the four vehicles represented by AFC Stock Nos. 481, 482, 520, and 521 were wrecked, "cut in half and not retail ready". (Tr. at 294, 340.) Thereafter, Plaintiff declared a default and demanded payment of the outstanding loan balance.

Teresa Vasile testified that she was not aware of Carl Vasile's practice of floor planning vehicles for a higher price that what he paid in order to cover repair costs. (Tr. at 247.)

## CONCLUSIONS OF LAW

Plaintiff seeks to have the debt owed it by Defendants excepted from Defendants' discharge under § 523(a)(2)(A) of the Bankruptcy Code. That section provides in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud;

11 U.S.C. § 523(a)(2)(A).

In order to except the debt from Defendants' discharge under 11 U.S.C. § 523(a)(2)(A), Plaintiff must prove that: (1) Defendants made a false representation with the purpose and intent to deceive Plaintiff; (2) Plaintiff justifiably relied upon the representation; and (3) Plaintiff sustained a loss as a result of the representation. *Lang v. Vickers (In re Vickers)*, 247 B.R. 530, 534 (Bankr.M.D.Fla.2000). Plaintiff bears the burden of proving the above elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to discharge must be strictly construed in order to give effect to the "fresh start" policy of the Bankruptcy Code. *See Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994).

Preliminarily, the Court addresses the issue of Teresa Vasile's liability. Plaintiff contends that Carl Vasile's fraud should be imputed to Teresa Vasile because during February 2001 she withdrew money from the account in which Plaintiff's December 2000 and January 2001 advances to Union Credit were deposited. Fraudulent intent may not be imputed from one spouse to another simply based on the marital relationship of the parties. *Synod of S. Atlantic Presbyterian Church v. Magpusao (In re Magpusao)*, 265 B.R. 492, 498 (Bankr.M.D.Fla.2001). In order for liability to attach, the person to whom intent is sought to be imputed must be aware of the spouse's misconduct and must participate in the use or enjoyment of the ill-gotten gains. *Id.* at 498. There is not a scintilla of evidence before the Court that Teresa Vasile was aware of Carl Vasile's

practice of floor planning vehicles for a higher price than what he paid for them in order to cover repair costs. Accordingly, to the extent that the Court finds that Carl Vasile's conduct constitutes fraud, the Court will not impute Carl Vasile's fraudulent intent to Teresa Vasile and will enter a judgment in favor of Teresa Vasile.

## I. *FALSE REPRESENTATION*

■ The Court must first determine whether Carl Vasile made a false representation to Plaintiff in order to obtain credit. Plaintiff asserts that the bills of sale and the wholesale orders (collectively, "the invoices") prepared by Carl Vasile and presented to Plaintiff misrepresented the actual purchase price Union Credit paid for the cars and motorcycles. Plaintiff points out that Union Credit had previously acquired the vehicles from other sources for far less money than the purchase prices represented on the invoices. Plaintiff contends that when a dealer submits an invoice in order to obtain floor plan financing there is an implicit assumption that the purchase and purchase price represent an arms length transaction. Defendants concede that the sales prices reflected on the invoices do not reflect the prices Union Credit originally paid for the vehicles and motorcycles in their wrecked condition but argue that the purchase prices were not false when they were submitted to Plaintiff. Defendants point out that Union Credit purchased the vehicles at salvage auctions after which the Car Clinic repaired them, utilizing parts in inventory or outside vendors. Defendants assert that by the time the motorcycles and cars were reassembled, Carl Vasile's investment approximated or exceeded the amounts reflected on the invoices.

The Court finds that the invoices Carl Vasile presented to Plaintiff were false. The Court thoroughly and meticulously re-viewed every file folder representing the vehicles and motorcycles for which Plaintiff was not repaid (Defs.' Exs. 92–112.) The four vehicles represented by AFC Stock Nos. 481, 482, 520, and 521 were wrecked when Union Credit purchased them, when AFC financed them, and when Gainey visited Union Credit's lot at the end of January, 2001. Union Credit purchased the vehicles for $1,600.00, $1,550.00, $3,095.00, and $2,090.00 respectively. On the invoices he presented to Plaintiff to obtain floor-plan financing, Carl Vasile represented that the vehicles' respective purchase prices were $12,500.00, $10,000.00, $18,200.00, and $12,000.00. Defendants presented no evidence documenting any repairs to the vehicles. Because Carl Vasile's investment in the vehicles was the amounts for which Union Credit originally purchased them, Defendants' assertion that the invoices were not false when submitted is itself false. Additionally, the vehicle folders for the motorcycles contained scant and confusing documentation. Even taking into account the documented repair and rebuilding expenses, the Court did not identify even one instance in which Carl Vasile's investment approximated the amount set forth on the invoice. In the absence of corroborative documentary evidence, Carl Vasile's assertion that his investment approximated or exceeded the purchase prices set forth on the invoices is insufficient.

## II. *INTENT TO DECEIVE*

■ The next issue before the Court is whether Carl Vasile submitted the invoices with the purpose and intent to deceive Plaintiff. Defendants contend that Carl Vasile did not intend to deceive Plaintiff because: 1) he made no attempt to conceal the relationship between Union Credit and Auto Temps; 2) Defendants did not personally benefit from the financings; 3) Carl Vasile cooperated with Plaintiff be-

fore and after the default; and 4) Carl Vasile was unfamiliar with the "fine print" on the back of the promissory notes and security agreements. Defendants' arguments are without merit. First, the lack of an affirmative effort on the part of Carl Vasile to conceal the relationship between Union Credit and Auto Temps does not establish that Carl Vasile did not intend to deceive Plaintiff. The Court finds that Carl Vasile was aware that Plaintiff did not know that he owned Auto Temps and consciously chose not to inform Plaintiff of that fact. Secondly, Defendants' post-default infusion into the business of $55,000.00 from draws on lines of credit on their otherwise exempt homestead, as well as Carl Vasile's cooperation with Plaintiff, establish an effort to repay the debt to Plaintiff but are not probative of, or relevant to, Carl Vasile's state of mind when he presented the invoices to Plaintiff. Although it does not doubt that Carl Vasile intended to repay Plaintiff, the Court cannot turn a blind eye to the method and mindset by which he obtained the money in the first instance. Finally, despite his assertion that he did not read the "fine print" on the loan documents, the Court finds that Carl Vasile, a savvy and experienced businessman, knew that the loan agreement required proof of the actual purchase price and that the agreement contemplated either: 1) an arms-length transaction between two unrelated companies or 2) disclosure by the dealer of the relationship between two related companies. Based upon the foregoing, the Court finds that Carl Vasile intended to deceive Plaintiff when he presented the invoices in order to obtain floor-plan financing.

### III. *JUSTIFIABLE RELIANCE*

The third issue before the Court is whether Plaintiff justifiably relied on the invoices submitted by Carl Vasile to obtain financing. "To constitute justifiable reliance, '[t]he plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility.'" *City Bank & Trust Co. v. Vann (In re Vann),* 67 F.3d 277, 283 (11th Cir.1995) quoting W. Page Keeton, *Prosser & Keeton on Torts* § 108 at 749 (5th ed.1984). However, justifiable reliance does not require objective reasonableness. *Vann* at 283. "Justifiable reliance is gauged by 'an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may be fairly charged against him from the facts within his observation in the light of his individual case.'" *Vann* at 283 quoting *Prosser & Keeton* on Torts § 108 at 751. "Additionally, '[i]t is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" *Id.* at 283 quoting *Prosser & Keeton* on Torts § 108 at 752. Finally, " 'the plaintiff is entitled to rely upon representations of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation can not offer as a defense the plaintiff's failure to make the investigation or examination to verify the same'" *Field v. Mans,* 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) quoting 1 F. Harper & F. James, Law of Torts § 7.12 pp. 581–583 (1956).

The Court finds that Plaintiff's reliance on the purchase prices on the invoices as representing the prices for which Union Credit initially paid for the vehicles was justified. The hallmark of the relationship between the parties was trust. (Tr. at 287–288.) Prior to the December 6,

2000 financings Union Credit had floor planned and paid off the loan balances on over 480 vehicles and had never missed a payment. (Tr. at 292–293.) Gainey testified that Union Credit was an ideal customer and that based upon Union Credit's and Carl Vasile's history with Plaintiff, he had no reason to doubt that the purchase prices on the invoices reflected the prices Union Credit originally paid for the vehicles and motorcycles. Plaintiff wanted to accommodate Carl Vasile and did so by floor planning the motorcycles for the amounts set forth on the invoices.

Defendants contend that there were numerous "red flags" which should have caused Plaintiff to 1) more closely scrutinize the values reflected on the invoice, 2) understand the nature of Union Credit's business, and 3) be aware of the relationship between Union Credit and Auto Temps.

Defendants contend that Par's visit to Union Credit on December 12, 2000 should have alerted Plaintiff that Carl Vasile was in the business of repairing wrecked vehicles and that the motorcycles and vehicles on the December 11, 2000 invoice (and subsequent invoices) had been wrecked and repaired prior to the floor planning.[5] Defendants point to the presence of a sign which read "The Car Clinic–Collision Specialists" and contend that the two cars for which Union Credit sought financing were still in their wrecked condition. Par testified that his visit was brief and that the primary focus of his visit was the motorcycles for which Carl Vasile sought financing, not the surrounding activity.[6] He also testified that the two cars included on the December 11, 2000 bill of sale were not wrecked. Defendants also point to Carl Vasile's alleged comment concerning the financing of the second batch of motorcycles. The Court does not find Carl Vasile's testimony on this point convincing. The Court finds that nothing which occurred during Par's December 12, 2000 visit to Union Credit establishes that Plaintiff's reliance upon the purchase prices set forth on the invoices was not justified.

Defendants also point to the fact that many of the motorcycle titles had the words "REBUILT" OR "ASPT" on the face of the titles. Defendants argue that Plaintiff should have known the difference between a "clean" title, a "REBUILT" title, and an "ASPT" title. In light of its inexperience with motorcycle floor plan financing, Plaintiff probably should have familiarized itself with the various motorcycle title designations. If it had done so, it may have been alerted to the fact that the motorcycles it financed had been wrecked and rebuilt or constructed from parts and that the purchase prices reflected on the invoices were not the prices for which Union Credit originally purchased them. However, it is clear to the Court that Plaintiff based its lending decisions on its

5. Defendants cannot be referring to AFC Stock Nos. 481, 482, 520, and 521 because they were not repaired before Plaintiff financed them.

6. Q: You're talking—you didn't see any wrecked vehicles being repaired there?
A: I mean, now it could be there are other vehicles getting repaired, but I can't tell you if it's wrecked or not, no.
Q: Did you see the repair—the mechanics there working on the vehicles?
A: Yes. You know, I have a dealer lot in Apopka, and I have three bays. That doesn't make me a—you know, I don't build wrecked cars. And I just recondition my cars. Doesn't make me a wreck builder, no. Because all dealers, they have—most of the dealers I know, they have one or two bays that they can work on cars, get them ready to sell. (Tr at 61–62.)

relationship and past dealings with Carl Vasile and attempted to accommodate him as best it could. It is also clear to the Court that Plaintiff relied on the titles primarily to ensure that Union Credit actually owned the motorcycles for which it sought financing. Plaintiff's failure to thoroughly analyze the various motorcycle title designations prior to extending credit does not render its reliance unjustified.

## CONCLUSION

When he submitted invoices to Plaintiff which misrepresented the actual purchase prices of vehicles he sought to floor plan, Carl Vasile made false representations to Plaintiff in order to obtain credit.[7] Carl Vasile's 1) knowledge that Plaintiff was unaware that Auto Temps, the seller of the vehicles, was a related company and 2) failure to inform Plaintiff of the relationship between Union Credit and Auto Temps, evidence an attempt to deceive Plaintiff. In light of its relationship and past dealings with Carl Vasile, Plaintiff's reliance on the invoices as representing the actual purchase prices of the vehicles and motorcycles was justified. The Court makes no determination of Carl Vasile's liability to Plaintiff nor the amount of the indebtedness, if any. The Court will not except the debt owed to Plaintiff by Teresa Vasile as a result of her January 19, 2000 personal guaranty from Teresa Vasile's discharge. The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.

---

**7.** The invoices represent AFC Stock Nos. 481, 482, 496, 498, 500, 501, 503, 508, 509, and 510–521.